1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF FLORIDA
2


3

  IN RE:                    CASE NO. 14-32819-JKO
4
  US CAPITAL/FASHION MALL, LLC,
5
             Debtor.
6  _____/
  IN RE:                    CASE NO. 14-32822-JKO
7
  US CAPITAL HOLDINGS, LLC,
8
             Debtor.
9  _____/
  IN RE:                    CASE NO. 14-32827-JKO
10
  MAPUCHE, LLC,
11
             Debtor.
12 _____/

13

14              ECF #107 (14-32819)

15              January 27, 2015

16         The above-entitled cause came on for hearing

17 before the Honorable JOHN K. OLSON, one of the Judges in

18 the UNITED STATES BANKRUPTCY COURT, in and for the

19 SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

20 Fort Lauderdale, Broward County, Florida on January 27,

21 2015, commencing at or about 1:30 p.m., and the following

22 proceedings were had.

23

24         Transcribed from a digital recording by:
                Cheryl L. Jenkins, RPR, RMR
25

Page 2

1

2

APPEARANCES:

3

4                KENNETH A. WELT, Trustee

5

GENOVESE JOBLOVE & BATTISTA, by
6          MICHAEL SCHUSTER, Esquire
           GLENN D. MOSES, Esquire
7           On behalf of the Trustee

8

STEARNS WEAVER, by
9          DAVID POLLACK, Esquire
           DREW DILLWORTH, Esquire
10     On behalf of Duane Morris, LLP, et al

11

MESSANA, P.A., by
12        THOMAS M. MESSANA, Esquire
          BRETT D. LIEBERMAN, Esquire
13         THOMAS ZEICHMAN, Esquire
           On behalf of the debtors

14

15            HOLLAND AND KNIGHT, by
              JOSE CASAL, Esquire
16          JOAQUIN ALEMANY, Esquire
   On behalf of Tangshan Ganglu Iron & Steel Co., Ltd.

17

18

GRAY ROBINSON, by
19     STEVEN SOLOMON, Esquire (via telephone)
   On behalf of BCEGI, LLC and GHJ Construction

20

21

MARKOWITZ RINGEL TRUSTY + HARTOG, by
22         JERRY MARKOWITZ, Esquire
                    and
23          RICHARD BERMAN, Esquire
             On behalf of Wei Chen

24

25

Page 3

1

2

CONTINUED APPEARANCES

3

4

DAMARIS D. ROSICH-SCHWARTZ, Staff Attorney
5                 Office of the U.S. Trustee
                   Department of Justice

6

7                     ALSO PRESENT

8           Lida Rodriguez-Taseff, Esquire

9             Rudolph Di Massa, Esquire

10            Lawrence Kotler, Esquire

11           Michael Silverman, Esquire

12              Rebecca Guillou

13               Molly Bowen

14    ECRO - Electronic Court Reporting Operator

15                  - - - - - - -

16

17

18

19

20

21

22

23

24

25

1          ECRO:  All rise.

2          THE COURT:  Thank you.  Please be seated.

3          Good afternoon.  In US Capital Fashion Mall

4   and the related cases, we have several matters on the

5   docket.  Let me take appearances, please.

6          MR. MOSES:  Good afternoon, your Honor.

7   Glenn Moses, Genovese Joblove & Battista.  I'm here with

8   my colleague, Michael Schuster, as well as Kenneth Welt,

9   Chapter 7 trustee.

10          THE COURT:  Thank you.

11          MS. ROSICH-SCHWARTZ:  Good afternoon,

12   your Honor.  Damaris Rosich-Schwartz on behalf of the

13   United States Trustee.

14          And, your Honor, just to, just to let you

15   know, around 3 o'clock I might have to sneak out to

16   Mr. Osborne's 341 room for a 341.  So, if you see me

17   running away ---

18          THE COURT:  If I see you run away, I will

19   assume that you -- that it is not that I have offended you

20   so thoroughly that you've run --

21          MS. ROSICH-SCHWARTZ:  Correct, your Honor.

22          THE COURT:  -- to escape.

23          All right.  Thank you.

24          Mr. Pollack.

25          MR. POLLACK:  Good afternoon, your Honor.

1    David Pollack, Stearns Weaver Miller, along with my

2    colleagues,  Drew Dillworth, who I know you know, and

3    Molly Bowen, who I suspect you don't, but Molly helped us

4    put the papers together.

5              THE COURT:  Thank you.

6              MR. POLLACK:  We are here representing the

7    subjects of your Honor's order to show cause, the four

8    Duane Morris lawyers and the firm.

9              THE COURT:  Thank you.

10             MR. MESSANA:  Good afternoon, your Honor.

11   Thomas Messana, counsel for the Chapter 7 debtors, and

12   with me are Brett Lieberman and Thomas Zeichman, attorneys

13   with my firm, and I'm here for the Chapter 7 debtors and,

14   of course, the attorneys with my firm and myself and my

15   firm.

16             THE COURT:  Thank you.

17             MR. MESSANA:  Thank you.

18             MR. CASAL:  Good afternoon, your Honor.

19   Jose Casal and Joaquin Alemany of Holland & Knight on

20   behalf of Tangshan Ganglu Iron & Steel Company, Limited in

21   accordance with your order to show cause.

22             THE COURT:  Thank you, Mr. Casal.

23             Mr. Markowitz.

24             MR. MARKOWITZ:  Good afternoon, your Honor.

25   Jerry Markowitz for Wei Chin.  Also here with me

Page 6

1   representing him is Richard Berman.

2              THE COURT:  Thank you.

3              Anyone else?

4              (No verbal response.)

5              THE COURT:  All right, then it seems to me

6   that the two motions ---

7              MR. SOLOMON:  Your Honor?

8              THE COURT:  Oh, yes.

9              MR. SOLOMON:  If I may, if I may interject?

10  It's Steven Solomon from Gray Robinson on behalf of GHJ

11  Construction.

12             THE COURT:  Thank you, Mr. Solomon.

13             Anyone else who wants to make an appearance

14  on the phone?

15             All right, then it seems to me that the two

16  matters that ought to be disposed of first are your

17  motion, Mr. Moses, for authority to operate the business,

18  and the continuation of the hearing on the second interim

19  order --

20             MR. MOSES:  Yes, your Honor.

21             THE COURT:  -- which did so.

22             MR. MOSES:  And when we filed the initial

23  motion, we had an agreement with the office of the United

24  Stats Trustee to periodically roll the 721 order on a

25  60-day basis.  Let me just give you a brief update as to

1    where we are in the case, your Honor.

2                    I'm actually pleased to report to your Honor

3    that we have a signed asset purchase agreement that was

4    signed this morning, and as of 15 minutes ago, we have the

5    deposit in my firm's trust account, and so we would expect

6    to file a motion to approve bidding procedures, bid

7    protections, and set this matter for a final hearing to

8    approve this sale.

9                    If all goes well with everyone's calendars,

10   we would expect to have the final sale hearing the first

11   week of April or so.

12                   So that's a preview, a brief preview of

13   that, but getting back to the 721 motion, we asked the

14   Office of the United States Trustee, in light of the

15   anticipated sale, that we roll this matter for 90 days

16   instead of the 60 days.

17                   We have consulted with the office of the

18   United States Trustee, they suggested a 45-day period.

19   We're happy to come back in 45 days.  I think it's more

20   logical to roll the 721 authority for -- at least through

21   the conclusion of what we hope to be the sale.

22                   This isn't necessarily a trustee operating a

23   business in the traditional sense, although the trustee is

24   obviously maintaining the property.  He has a few minimal

25   employees making sure it's maintained.  We have a security

1   company, and we're obviously securing and preserving the

2   asset.

3               THE COURT:  So you would want to come back

4   on a -- looking for a sale date in -- aiming in that

5   direction at least late April, sometime in May, is that

6   where ---

7               MR. MOSES:  No.  Actually, your Honor, a

8   little earlier than that.

9               THE COURT:  All right.

10              MR. MOSES:  What we'd anticipate, and this

11  is -- maybe we're getting ahead a little bit, there is a

12  motion to convert, to convert the case to a Chapter 11

13  proceeding.

14              THE COURT:  Right, and that's been

15  rescheduled to February 12th at 1:30.

16              MR. MOSES:  Correct, your Honor, and so we

17  would anticipate filing, possibly as early as tomorrow, a

18  motion to approve the bidding procedures, and would ask

19  that that be set at the same time as the conversion

20  motion.

21              THE COURT:  That makes perfectly good sense

22  to me as well, and if you want to, when you submit the

23  motion for the bidding procedures, you can note in the --

24  both in the caption of the motion, and in the body of it

25  that a hearing on the motion will be held on February 12th

1    at 1:30.

2                    MR. MOSES:  Thank you, your Honor, and we

3    will do that, and then obviously at that hearing, if

4    your Honor either decides the conversion motion, or

5    approves the bidding procedures, we'll ask your Honor to

6    set a sale hearing in the beginning of April, so rolling

7    back to the 721 --

8                    THE COURT:  Right.

9                    MR. MOSES:  -- request, we ask that we have

10   authority to operate at least through sometime the middle

11   or late April.

12                   THE COURT:  Okay.  Does anyone want to be

13   heard in connection with the operating authority question?

14                   MS. ROSICH-SCHWARTZ:  Good afternoon again,

15   your Honor.  Just very briefly, that the U.S. Trustee

16   believes that 90 days is a bit too long.  However, we

17   understand the circumstances of this particular case and

18   why the trustee is requesting the same.

19                   THE COURT:  It's an unusual case in oh so

20   many ways.

21                   How about we do this on April 22nd, and aim

22   for that, and so let's roll the 721 motion to April 22nd

23   at 1:30.

24                   MR. MOSES:  Thank you, your Honor.  We'll

25   submit an order.

1          THE COURT:  And give me an order to that

2     effect if you will --

3          MR. MOSES:  I will.

4          THE COURT:  -- Mr. Moses.

5          MR. MOSES:  And perhaps before we begin with

6     the order to show cause, as maybe a housekeeping question

7     regarding the new hearing date on the motion to convert,

8     we noticed that the notice of hearing not only moved it

9     from the 10th to the 12th, but also changed it from a 10

10    minute hearing to a three hour hearing, yet it's still

11    scheduled as a non-evidentiary hearing.  We were a little

12    confused and weren't sure ---

13         THE COURT:  Well, I suppose the motion to

14    convert should be an evidentiary hearing if, if -- it was

15    scheduled on the block of time when I normally have

16    Chapter 11 hearings, and I normally don't expect them to

17    go more than 10 or 15 minutes.

18         I didn't think it likely that that issue

19    could be heard in that amount of time.  Is there a reason

20    for us to have the hearing on February 12th as a

21    non-evidentiary hearing?

22         MR. MOSES:  From the trustee's perspective,

23    we would ask that it be heard as a non-evidentiary

24    hearing, at least preliminary, because if it is going to

25    be scheduled for an evidentiary hearing, your Honor, we've

1    been focused on the, in addition to many other things in

2    this case, we've been focused on getting the asset

3    purchase agreement negotiated and executed, and will be

4    moving forward with that.  Obviously if there is going to

5    be an evidentiary hearing in a couple of weeks on the

6    conversion motion, we would like the opportunity to take

7    some discovery.

8                    THE COURT:  Of course.

9                    MR. MOSES:  If it's okay with counsel for

10   Ganglu, we would request that it at least be heard as a

11   preliminary, non-evidentiary matter.  Your Honor may be

12   able to dispose of --

13                   THE COURT:  Parts?

14                   MR. MOSES:  Possibly, without the need for

15   evidence, or your Honor might not, but either way we

16   would, the trustee would like some finality with respect

17   to the sale issue, because we have buyers out there that

18   have seen the motion to convert, they saw that, you know,

19   within two hours of the motion to convert hitting the

20   docket, there was an article in the South Florida Business

21   Journal saying that the trustee's Chapter 7 sale might be

22   negated by virtue of this conversion motion.  So we'd like

23   to get some clarity out --

24                   THE COURT:  That's ---

25                   MR. CARTER:  -- to the community one way or

1    the other.

2                        THE COURT:  That's fair.

3                        All right.  Mr. Casal, I saw you coming up.

4    Non-evidentiary hearing?  The reason I set it for three

5    hours is only so that I didn't have you in here for what

6    is a normal motion calendar morning that, frankly, you'd

7    occupy too many seats for everybody to be comfortable.  It

8    would look like Chapter 13 day, and while I would invite

9    any of you to come to a Chapter 13 day, I'll spare you

10   from that pleasure for the moment.

11                        MR. MOSES:  Thank you.

12                        MR. CASAL:  Judge, when the matter was

13   originally noticed for hearing, I assumed that it was

14   going to be treated as a preliminary hearing to ascertain

15   then exactly what the parties would require in the case of

16   a final hearing, whether it was going to be an evidentiary

17   hearing, and what the Court would be looking for, and

18   maybe use that as a scheduling opportunity.

19                        So, when I saw the re-notice yesterday, I

20   assumed that the Court had wanted to treat that as an

21   evidentiary hearing for purposes of disposing of the

22   motion.

23                        I just found out today, right now, that the

24   trustee has an executed asset purchase agreement.  I don't

25   know anything about it.  I don't know who the stalking

```
 1   horse is.  I don't know what the purchase price is.  I
 2   don't know anything.
 3               THE COURT:  You and me both.
 4               MR. CASAL:  Yes, so we're going to find out
 5   together.  I don't want to jeopardize ---
 6               THE COURT:  I hope you find out sooner than
 7   I do.
 8               MR. CASAL:  I hope I find out after this
 9   hearing.
10               MR. MOSES:  I can tell you all right now.
11               THE COURT:  Well, do you want to name the
12   price?
13               MR. MOSES:  Yes.
14               THE COURT:  Okay.
15               MR. MOSES:  It's $24 million.
16               THE COURT:  Okay.
17               MR. CASAL:  And so all we ask, Judge, is we
18   want the opportunity to present our case, to show why my
19   client, Tangshan Ganglu, should have an opportunity to
20   reorganize this debtor, and we don't want, obviously, the
21   freight train of a 363 sale to derail our opportunity to
22   present our case.
23               THE COURT:  I don't intend for that to
24   occur.  I intend to give everybody a fair shot at this
25   thing.
```

```
 1                    At the moment I don't know what the issues
 2   on either side are.  I've read your motion, but I don't
 3   know much from it.  So, I'm not going to think about it
 4   too terribly hard.
 5                    I'm inclined to have that hearing be
 6   non-evidentiary.  I simply moved it a day or two because I
 7   wanted to give you a fair opportunity, without hoards
 8   breathing down your neck, or vis-a-versa, and so set aside
 9   the afternoon, but let's do it non-evidentiary, and we can
10   figure out where we go from there in what's now two weeks.
11                    MR. MOSES:  Thank you, your Honor.
12                    MR. CASAL:  Thank you, Judge.
13                    THE COURT:  Okay.
14                    MR. MOSES:  Thank you for your
15   clarification.
16                    THE COURT:  Very good.  Thanks.
17                    All right.  That takes care of the easy
18   parts of this.
19                    We now come to the order to show -- is there
20   anything else on the calendar except the order to show
21   cause?
22                    (No verbal response.)
23                    THE COURT:  All right.  Mr. Pollack, I will
24   hear from you first, I think.
25                    MR. POLLACK:  Thank you, your Honor.
```

1              Your Honor, before I begin my remarks, I

2    would like to introduce you, and in one case reintroduce

3    you to Duane Morris lawyers who are sitting here in the

4    courtroom.

5              In the first row is Kevin Vance and

6    Lida Rodriguez-Taseff.

7                   THE COURT:  Good afternoon.

8                   MS. RODRIGUEZ-TASEFF:  Good afternoon,

9    Judge.

10                   MR. POLLACK:  Next to them you may recognize

11   (inaudible) --

12                   THE COURT:  I do.

13                   MR. POLLACK:  -- from the firm, our tech

14   guy.

15                   THE COURT:  I do.  Nice to have you in

16   Court.

17                   MR. POLLACK:  And in the second row, from

18   your left to your right, we have Lawrence Kotler,

19   Rudolph Di Massa, who was almost universally known as

20   Skip, and a legal assistant from the firm who has

21   submitted an affidavit, Rebecca Guillou.

22                   THE COURT:  Very good.  Welcome to you all.

23                   UNIDENTIFIED:  Thank you, your Honor.

24                   MR. POLLACK:  And also before I begin my

25   remarks, Ms. Rodriguez-Taseff has asked me to ask you for

1   permission to address the Court directly.

2            THE COURT:  I will, I will certainly

3   entertain comments from her directly.  I think I'd rather

4   hear from you first so I know what we're talking about

5   from your perspective.

6            MR. POLLACK:  Certainly.

7            What you would have heard, and will hear

8   from Ms. Rodriguez-Taseff is, in part, an oral restatement

9   of the apologies that are contained in her affidavit, and

10  in addition she -- and I will preview with you,

11  your Honor, that she will tell you that she has thought a

12  lot about the order to show cause, and what happened to

13  cause her to misapprehend the events of the October 30

14  hearing, and she has -- she would like to address that

15  kind of soul searching and what it is that she feels that

16  she might have done better, should have done better, and

17  will in the future do better.

18            She can't, of course, assure anyone that her

19  attention will never again wander.  I don't think anybody

20  could make any assurances of that, that's just part of who

21  we are, but she will, in the future, if these sorts of

22  events were to recur, do two things that she didn't do

23  this time.  The first is, if it turns out that she and the

24  lawyer on the other side disagree about what happened, she

25  will immediately order the transcript and read it, and not

1    rely on her own recollection of events, and the second is

2    not rely on what we, I think, have all come to rely over

3    much on, and that is exchange of e-mails, which is not the

4    most effective form of communication, but will pick up the

5    phone, call opposing counsel and say, well, tell me what

6    you think happened, and why, and I'll tell you what I

7    think happened and why.

8              Clearly if she had done either or both of

9    those things, I suspect that the Court would not have

10   issued the order to show cause, and we would not have all

11   gathered here this afternoon.

12             I know that you have read what we have

13   submitted.

14             THE COURT:  I have.

15             MR. POLLACK:  And I also know that you have

16   absorbed it and understand it, and so I propose not merely

17   to regurgitate what's in the papers, but talk about it

18   from a slightly different perspective, and I was trying to

19   think of, of a caption in a brief, or a headline that

20   captures what happened, what I perceive very clearly to

21   have happened based on what has became our molecular

22   re-examination of every piece of paper in the record, and

23   what I came up with was the title of a fairly recent movie

24   called Lemony Snicket's, a Series of Unfortunate Events,

25   and in retrospect, and with the perspective of looking at

1    everything at once, rather than one thing at a time, what

2    we have here is a series of unfortunate events that took

3    place in a very compressed period of time, one week from

4    start to finish, and I'll start with your Honor's agreed

5    order of October 28th, 2014, and that was the agreed order

6    granting Mapuche's motion to continue the October 30th

7    hearing on Ganglu's motion for stay relief, and that's at

8    DE 31 of the Mapuche case, and the order ---

9            THE COURT:  In Mapuche or in -- I think

10   everything is -- isn't everything in US Fashion -- Capital

11   Fashion Mall now, or is it separately -- was it separately

12   docketed in Mapuche.

13           MR. POLLACK:  It was.

14           THE COURT:  Okay.

15           MR. POLLACK:  It may now be in US Fashion

16   Mall, but it was -- originally appeared as DE 31 in

17   Mapuche.

18           THE COURT:  Okay.

19           MR. POLLACK:  And that order, as everyone in

20   the courtroom recalls, set a hearing date, a new hearing

21   date of November 25, 2014.

22           The first unfortunate event is that the

23   order did not address what happens to the stay in the

24   interim.

25           Now we move forward two days to the hearing

Page 19

1    on October 30th.

2              Because the motion to lift the stay for

3    limited purposes was taken off the calendar, Duane Morris'

4    bankruptcy lawyers, Messrs. Kotler and Di Massa did not

5    fly in from Philadelphia for the hearing, and that's the

6    second unfortunate event.

7              Ms. Rodriguez-Taseff, who is not a

8    bankruptcy lawyer, did attend, as did Brett Lieberman, and

9    you will recall that Mr. Messana had filed a notice of

10   unavailability and was off in -- on safari in Africa, and

11   I want to take a look with you at part of what happened at

12   that hearing.  Mr. Lieberman, and this is at Page 18, said

13   he had a housekeeping matter to take up with the Court,

14   and he said, I would request that the Court modify its

15   order on the continuance to include a, and then a pause,

16   the contemplation of 362(e).  Since the continued hearing

17   is after the 30 days from the filing of the motion, we'd

18   ask that the stay just stay in place until the hearing be

19   had on that, and then you ask:  The Court:  Any objection,

20   Ms. Rodriguez?  And she said:  Yes, your Honor.  And she

21   goes on to state Ganglu's objection.

22              The reference, that is Mr. Lieberman's

23   reference to 362(e), of course, is to the Bankruptcy Code,

24   and 362(e)(1) says in pertinent part, 30 days after a

25   request for relief from the stay, such stay is terminated

1   with respect to the party in interest making such request

2   unless the Court, after notice and a hearing, orders such

3   stay continued in effect.

4               The, the request that Mr. Lieberman made of

5   you, however, was unnecessary because of Local

6   Rule 4001-1(H), which says a party seeking relief from the

7   stay, who consents to continuance of the hearing, waives

8   the right to enforce the 30-day rule contained in 11 USC

9   362(e), and that's where the unfortunate absence of the

10  Duane Morris bankruptcy lawyers comes into play.  They

11  weren't there to say, well, that's not necessary, Judge,

12  because we've got a local rule, and the stay automatically

13  stays in effect until the hearing, the new hearing date,

14  and the determination of the motion.

15              But in any event, as everyone knows, the

16  hearing continues, and your Honor says, okay, I'm going to

17  give the trustee an opportunity to do some thinking about

18  this as well, and I don't know what the trustee's position

19  on any of it is, and says, and since there was an

20  agreement to continue this, I'll stick the parties with

21  that agreement, and then the fateful sentence that Ms. ---

22              THE COURT:  The four lines which constituted

23  the ruling from the hearing.

24              MR. POLLACK:  Yes, the hearing on the motion

25  for the stay relief in Mapuche is continued to

1    November 25th, and the automatic stay is continued through

2    the conclusion of that hearing, and a ruling on that

3    motion, and that is the next unfortunate event, and you

4    have read Ms. Rodriguez-Taseff's affidavit, she just

5    either didn't hear it, or it didn't sink in, because she

6    was so focused on your having said that you would give the

7    trustee the opportunity to weigh in.  She immediately

8    processes that as, I've got to get the trustee on my side,

9    I need to talk to the trustee, to trustee's counsel.  If

10   the trustee weighs in in favor of stay relief, we're going

11   to get it because, as she had argued earlier, and a part I

12   didn't put up, she believed that the debtor didn't have

13   standing to contest the stay relief motion.  So that's,

14   that's her state of mind.

15                THE COURT:  And so she didn't, in her

16   version of events, listen for the ruling, which consists

17   of four lines.

18                MR. POLLACK:  That's absolutely right,

19   your Honor, for which she is sincerely apologetic.

20   Obviously if she were able to jump into and command a time

21   machine, she'd go back and she'd listen, and none of this

22   would have happened, but the -- and I understand,

23   your Honor, that judges don't like it when they say things

24   and lawyers don't hear them, or don't understand them,

25   even though they're pretty obvious and in plain English,

1   but the truth of the matter is, Judge, that her focus was

2   on the trustee, and speaking to Mr. Moses, and getting his

3   view, and if it was positive, getting that view in front

4   of your Honor, and so there was a disconnect in her

5   attention to what was going on on the Bench because of

6   that displaced focus.

7              THE COURT:  And there was then a disconnect

8   from the next two things which happened, were that I

9   directed Mr. Lieberman to give me the order.

10             MR. POLLACK:  Correct.

11             THE COURT:  I asked him to run it past

12  Ms. Rodriguez --

13             MR. POLLACK:  Right.

14             THE COURT:  -- and Mr. Moses, and

15  Ms. Robson, and that leads to my second area of concern

16  here, that Ms. Rodriguez took it upon herself not only to

17  submit an order as an agreed order, which was not an

18  agreed order, that was contrary to my ruling, that was

19  contrary to my direction as to who should prepare the

20  order, and contrary to all good practice that requires

21  that orders, particularly in complicated cases, be

22  circulated before they're submitted.  She did none of

23  that.

24             MR. POLLACK:  Well, I beg to differ.

25             THE COURT:  Okay.  Differ away.

1          MR. POLLACK:  The first thing that happens

2   is she talks to Mr. Moses outside after the hearing, and

3   he tells her, we support Ganglu's stay relief motion, and

4   the trustee will submit a stipulation to that effect, and

5   the very next morning Mr. Moses e-mails

6   Ms. Rodriguez-Taseff, hi, Lida, please see the attached,

7   the attached, you will see, Judge, is stay relief -- it's

8   a stay relief stip.  Hi, Lida, please see the attached,

9   the stay relief stip.  I think we can file a notice of the

10  stipulation which addresses the trustee's formal position

11  on stay relief.  Let me know your thoughts.

12          So -- and the attached stipulation is as

13  advertised in the e-mail, and ends with all these

14  wherefore clauses, as they usually are in a stipulation,

15  but then ends in the trustee, Ganglu and Mr. Du stipulate

16  as follows, the trustee does not object to the relief

17  sought in the stay relief motion, it consents to the entry

18  of an order granting the same, and so

19  Ms. Rodriguez-Taseff, who didn't hear what you said, but

20  was focused rather on getting the trustee in her camp, now

21  has the trustee in her camp, she's got a stipulation that

22  the trustee's counsel provided, and she is a happy woman,

23  because she is going to be able to file a stipulation with

24  the Court which will be responsive to your Honor's request

25  of the trustee for its position, and the position will be

1    we consent to the relief requested in Ganglu's motion, and

2    so what Ms. Rodriguez-Taseff does is -- there is a little

3    editing of the stipulation.  Everybody -- the two parties

4    to it agree to it, and she directs that it be filed, and

5    it is filed, and it's DE 38 in the consolidated cases, US

6    Capital Fashion Mall, and it is filed on Monday,

7    November 3rd, just after noon, 12:06, and to your Honor's

8    point of these things should be circulated to everybody,

9    because it's filed on PACER, notice will be electronically

10   mailed to, and then there is a list of people to whom it

11   will be mailed, and one of them is Brett Lieberman, on

12   behalf of the debtor, and he receives it.  So there is no

13   question, he doesn't debate that he received it, nor does

14   anyone else who was on the e-mail strip -- not the e-mail

15   strip, excuse me, the service list.

16              And what is filed is both the stipulation,

17   which has been revised, edited, with the consent of both

18   parties, and so the last sentence now reads:  The trustee

19   does not object to the relief sought in the stay relief

20   motion, and consents to the entry of the proposed agreed

21   order granting the relief sought, which is attached hereto

22   as Exhibit A, and then you get to Exhibit A, and then you

23   get to the agreed order granting the motion.

24              So, you have not just Duane Morris for

25   Ganglu, but also trustee's counsel for trustee agreeing

1    together to file via PACER an e-mail to everybody, the

2    stipulation between them, with the agreed order as an

3    exhibit to the stipulation, and we said this in the

4    papers, Judge, but I want to reemphasize it, because it's

5    crucial.

6                   THE COURT:  But the agreed order was not

7    circulated before it was submitted?

8                   MR. POLLACK:  That is right.  That is right.

9    It was not.

10                  THE COURT:  Why not?

11                  MR. POLLACK:  The -- it's an exhibit to a

12   stipulation.  It, it -- all other things being equal, and

13   things had proceeded in what I'll call the ordinary

14   course, this stipulation, with the attached proposed

15   agreed order, would have -- it was filed in PACER, it's on

16   the docket, it would have sat there until November 25th

17   when there would have been a hearing, and your Honor would

18   have looked at it, and would have entered it or some other

19   order, depending on how your Honor decided the hearing on

20   November 25th, but -- and, again, this is beyond what

21   Ms. Rodriguez-Taseff heard and understood on October 30th,

22   a proposed order is about to be -- well, Mr. Lieberman

23   calls it uploaded, but e-mailed to your law clerk, and so

24   then you get into an exchange of contesting orders,

25   competing orders, and so it wasn't circulated in the first

1    instance because it was not expected that anything would

2    happen with that stipulation and order until the hearing,

3    and then it would be a proposed order entered on the

4    hearing, and -- just like any other proposed order that

5    anybody else might submit to the Court.

6              But as the events unfolded, that decision

7    was sort of overtaken because it was circulated to

8    everybody, although, again, not in advance.

9              But, your Honor, when the stipulation with

10   the Exhibit A, proposed agreed order, and then later on

11   proposed amended agreed order that clarifies between whom

12   the agreement is, it's, it's e-mailed via ECF to counsel

13   for all the parties once it's filed, and then it's

14   e-mailed by the Duane Morris Miami office to lawyers for

15   all of the parties when -- after, I should say,

16   Mr. Lieberman e-mails his proposed agreed -- amended

17   agreed order continuing the hearing.

18              THE COURT:  I don't think Mr. Lieberman

19   submitted an agreed order, did he?

20              MR. POLLACK:  Yes.

21              THE COURT:  You sure he submitted an agreed

22   order?

23              MR. POLLACK:  Yeah.

24              THE COURT:  Okay.  All this is happening,

25   you'll understand, Mr. Pollack, when I'm in Italy.

1           MR. POLLACK:  Your Honor, you are righter

2   than I am.  What he submitted was an order amending the

3   agreed order.  Not an agreed order amending agreed order.

4   So forgive me if I misspoke, but originally it was an

5   agreed order, Ganglu agreed to continue the hearing, and

6   then you told them, okay, you know, up -- well, not

7   upload, but submit -- I don't know if you used the word

8   upload, but --

9           THE COURT:  Probably.

10          MR. POLLACK:  -- essentially submit an

11  amended order to add that the stay stays in effect, and he

12  did, and that -- okay.  So he does, and then what that

13  does is it implicates Ms. Rodriguez-Taseff's

14  misapprehension, and she submits a competing order, and

15  you have seen, Judge, in the back and forth that

16  Mr. Brownell actually e-mails to Ms. Rodriguez-Taseff and

17  says, are you going to submit a competing order?  And let

18  me show you that.

19          From Mr. Brownell to Ms. Rodriguez-Taseff,

20  are you submitting a competing order, and everybody is --

21  again, all the lawyers are copied, and

22  Ms. Rodriguez-Taseff, who is out of the office, as you can

23  see this e-mail was sent from her iPhone, she e-mails

24  Ms. Guillou, a legal assistant, resubmit the stop, you

25  know, it's an iPhone.

```
 1                    THE COURT:  I can't, I can't hit all the
 2         right letters either.
 3                    MR. POLLACK:  Right.  I have -- you probably
 4         have noticed over time, I have fat, awkward fingers.  So I
 5         can never do anything on ---
 6                    THE COURT:  Don't, don't characterize your
 7         client, Mr. Pollack.
 8                    MR. POLLACK:  No, no, no, I have -- sent
 9         from an iPhone, and she says to Ms. Guillou, resubmit the
10         stop, meaning stip, obviously, and order, and earlier in
11         the day, the same day, this compression again, in response
12         to Mr. Lieberman e-mailing Mr. Brownell his amended --
13         proposed amended agreed order continuing the hearing,
14         Ms. Rodriguez-Taseff, out of the office all day, asks
15         Ms. Guillou, submit -- I'll go back and show you what she
16         says, again, earlier the same day, again sent from her
17         iPhone to Ms. Guillou, she forwards, and you can see at
18         the bottom there Mr. Lieberman's e-mail submitting -- to
19         Mr. Brownell submitting the proposed amended agreed order,
20         and Ms. Rodriguez-Taseff, from out of the office, forwards
21         that e-mail to Ms. Guillou, you say please send
22         Mr. Brownell our joint stipulation and proposed order.
23         See the e-mail below.  Do the same thing he did.
24                    So, in Ms. Rodriguez-Taseff's mind, she is
25         adhering to the standard of submitting proposed orders in
```

1    the Bankruptcy Court.  She instructs her secretary, do the

2    same thing Mr. Lieberman did and Ms. Guillou, in fact,

3    does exactly that by, a few minutes after the e-mail,

4    sending to Mr. Moses, and this is on the 4th, in the

5    morning, please find attached the stipulation on motion

6    for relief from the automatic stay, along with the

7    proposed agreed order, subsequently we filed a proposed

8    amended agreed order.

9                    THE COURT:  When was that amended agreed

10   order filed?  When was -- well, let me ask the chronology.

11                   MR. POLLACK:  Yes.

12                   THE COURT:  When was the proposed agreed

13   order submitted?  That was at -- that's at ECF 38, when

14   was that filed, and when was the amended agreed order

15   filed, and at what -- and in what manner was the amended

16   agreed order filed?

17                   MR. POLLACK:  Here is the -- 38.

18                   THE COURT:  So, that was filed at noon on

19   the 3rd?

20                   MR. POLLACK:  Yes, 12:06 on the 3rd.

21                   THE COURT:  All right.

22                   MR. POLLACK:  And then what happens is,

23   Mr. Moses calls Duane Morris' office and says, I have some

24   edits to the agreed order, we're going to need to resubmit

25   this, and so the edits to the agreed order, the proposed

1   agreed order are made, and the stipulation is refiled

2   4:46, later that same afternoon.

3                  THE COURT:  And how was it filed, was it

4   filed --

5                  MR. POLLACK:  Again --

6                  THE COURT:  -- electronically?

7                  MR. POLLACK:  -- PACER.

8                  THE COURT:  Uh-huh.

9                  MR. POLLACK:  And, again, Judge, notice will

10  be -- I used to be better at this, electronically e-mailed

11  to, among other people, Brett Lieberman, and he got it, as

12  did everybody else on the service list.

13                 So, in the same afternoon the stipulation,

14  with the proposed agreed order, and then the stipulation

15  with the proposed amended agreed order, and the amended

16  agreed order, your Honor, as I think you know, has a

17  footnote, the form of this amended agreed order has been

18  agreed to by the trustee, but not by the debtors or by

19  Mr. Wei Chen, and that is circulated to everybody the same

20  afternoon, and filed on PACER, ECF e-mailed to all

21  counsel.

22                 So, so that's the state of play when

23  Mr. Lieberman submits via e-mail, as you have instructed

24  him to, a proposed order amending agreed order, and you

25  see it's the, it's the same day, it's November 4th, it's

1    happening at the same time, again, it's all compressed.

2              THE COURT:  Was your client's -- or, yes,

3    the amended agreed order, how was that uploaded, was that

4    filed as a docket entry, or was that uploaded into the

5    orders box?

6              MR. POLLACK:  Nothing was submitted via

7    e-orders, and Ms. Guillou specifically says that in her

8    affidavit, and she was doing this filing, every one of

9    them.  Nothing was submitted that way.  Everything was

10   done publicly and openly, both the stipulation with the

11   agreed order, and then the stipulation with the amended

12   agreed order were filed on PACER, the agreed order was not

13   filed standalone anywhere, it was always Exhibit A to the

14   stipulation, and as you know, when you file something on

15   PACER, it's automatically e-mailed to everybody, all the

16   lawyers on the service list, and it was, twice in the same

17   afternoon.

18             THE COURT:  Mr. Pollack, I have known you

19   for a long time, and I have enormous regard for you as a

20   lawyer, and as my former law partner.

21             Have you ever filed as an agreed order

22   something that wasn't agreed by everyone in the case?

23             MR. POLLACK:  I don't remember, but as a

24   hypothetical question, I can, I can conceive of

25   circumstances when I would do it, and I think I would

1    always do what they did in the amended agreed order, which

2    is define among or between which parties the agreed order

3    is being submitted but, for example ---

4                   THE COURT:  But the agreed order grants stay

5    relief, does it not?

6                   MR. POLLACK:  Yes.

7                   THE COURT:  In toto, something which I --

8    yes, it granted stay relief to go litigate -- well, let's

9    -- pull up, pull up the amended agreed order then, and let

10   me look at exactly what relief it granted.

11                  MR. POLLACK:  It's the two things that were

12   in the motion, getting the order entered, and then

13   addressing and deciding the ratification issue.

14                  THE COURT:  Yes, which is something which I

15   had not addressed at the October 30th hearing and, in

16   fact, something which after it was addressed at the

17   November 25th hearing I denied.

18                  MR. POLLACK:  Correct.

19                  THE COURT:  And my order on -- at the

20   October 30th hearing could not have been clearer, it was,

21   the stay remains in effect through the hearing, and a

22   ruling on the hearing on November 25th because the parties

23   had agreed to it, and now I'm getting an order that goes

24   so far beyond what I ruled, that I think it's -- maybe the

25   wish becomes father to the thought.  But in a four line

1    ruling, Ms. Rodriguez gave me exactly the opposite of what

2    I ruled, and I'm offended by that.

3              MR. POLLACK:  I perceived that, Judge.  I

4    perceived it when I read the order to show cause.

5              I know you as long as you know me, and I

6    know you're offended by it, but I ask that you accept, and

7    I expect that you will visit with Ms. Rodriguez-Taseff

8    later, but if you accept her sworn affidavit that it

9    didn't sink in, and her focus was, the Judge wants to hear

10   from the trustee, then she gets a stipulation to stay

11   relief from the trustee ---

12             THE COURT:  And then prepares an order which

13   she does not circulate as a form of order, rather just

14   files it.

15             MR. POLLACK:  But it's attached to a

16   stipulation and, Judge, as I said a little while ago, but

17   for what she didn't anticipate, which was the order that

18   -- the proposed order that Mr. Lieberman e-mailed to

19   your Honor's law clerk that same day, it would have just

20   sat there in the court file.

21             THE COURT:  How is that possible?  I asked

22   Mr. Lieberman expressly to give me an order that continues

23   the automatic stay in place until November 25th.

24             MR. POLLACK:  Yes, I will tell you how that

25   could be, because somewhere around here the switch was

1   flipped and Ms. Rodriguez-Taseff just lost focus, and the

2   below the line stuff was the stuff that she just didn't

3   take away from the hearing and, and, yes, what was -- I'm

4   not going to debate that the order that was prepared and

5   submitted was inconsistent with what you said on the

6   record, no one is going to debate that.

7           The issue, though, is was it intentional.

8   The issue was, was there bad motive.  The issue was, was

9   there an improper purpose, and the answer to that is

10  plainly, no, if you give any credence to the affidavits

11  that we have filed.

12          And, Judge, I want to mention something

13  else.  Stepping back, if you look at the date that the

14  motion to lift stay was filed, it was October 17th, 30

15  days from that is November 16th, which is a Sunday.  So,

16  the stay would have expired on the 17th, but for what

17  your Honor ruled, and Ms. Rodriguez-Taseff didn't hear,

18  and the local rule, both of which kept them in place.

19          So, assuming she's not aware of any of that

20  stuff, because bankruptcy is not her bailiwick, it's not

21  her milieu, is she going to mislead people to gain an

22  eight-day advantage, from November 17th to November 25th,

23  the date of the hearing?

24          Your Honor, I ---

25          THE COURT:  Well, she would gain a

1    significant advantage over the results of the

2    November 25th hearing, because I never permitted -- I have

3    yet to permit the third part of her stated form of stay

4    relief.

5              MR. POLLACK:  Agreed, but remember her ---

6              THE COURT:  And I never, never ever said

7    that I was granting that kind of relief.

8              MR. POLLACK:  Agreed, but remember what her

9    state of mind is, you want to hear from the trustee, she

10   believes that the debtor has no standing.  If the moving

11   party --

12             THE COURT:  So she was going to make that

13   decision for me, too?

14             MR. POLLACK:  No, no, no.  She and the

15   trustee -- well, Ganglu and the trustee together, through

16   their counsel both drafted, edited the stipulation, and

17   the proposed agreed order thinking there was nothing wrong

18   with it, and I'm sure Mr. Moses is not going to -- if he's

19   going to say anything, he's not going to stand up here and

20   tell you that, you know, we expected that you were going

21   to take that as an agreed order, that everybody agreed to

22   it and enter it.  That wasn't in their contemplation.  The

23   contemplation was to ---

24             THE COURT:  Well, why would you -- why would

25   someone submit an agreed order if it was not contemplated

Page 36

1    that the Court was going to enter it.

2                   MR. POLLACK:  Until the hearing.

3                   THE COURT:  You asked me to enter it.

4                   MR. POLLACK:  Until the hearing.  Remember

5    it was just filed.  You were to look at it with everything

6    else at the hearing on the 25th.

7                   THE COURT:  Then why was it up --

8    secondarily uploaded after Mr. Lieberman uploaded an order

9    that was, in fact, consistent with the ruling?

10                  MR. POLLACK:  Okay.  Well, first of all,

11   Ms. Rodriguez-Taseff and Mr. Lieberman had exchanged

12   e-mails disagreeing with each other about what had

13   happened at the hearing, and so ---

14                  THE COURT:  And isn't that when a reasonable

15   lawyer circulates the order first, A --

16                  MR. POLLACK:  Well ---

17                  THE COURT:  -- or, B, orders the transcript?

18                  MR. POLLACK:  Well, and as I said, that's

19   what Ms. Rodriguez-Taseff has concluded that she should

20   have done, is profoundly sorry and apologetic that she

21   didn't do it but, in fact, she didn't, and her state of

22   mind was, well, Mr. Lieberman has uploaded an order, which

23   I believe incorrectly articulates what occurred at the

24   hearing.

25                  THE COURT:  Based on God knows what, because

1   it was completely consistent with the ruling at the

2   hearing.

3           MR. POLLACK:  I understand that it was, and

4   she understands now that it was also, but did not at the

5   time.

6           And so what she tells, from out of the

7   office, what she iPhones her legal assistant is, do what

8   Lieberman did, e-mail our order, our stipulation and

9   proposed agreed order to Mr. Brownell, which she does, and

10  sends copies to lawyers for every party and, Judge, not

11  to, not to lose track, but there is a part of your order

12  to show cause that says that Duane Morris, in re -- in

13  submitting that competing order, Duane Morris removed,

14  removed, which I think is a loaded verb, Mr. Lieberman

15  from the e-mail distribution list, and I think you picked

16  that language from their preliminary objection.

17          THE COURT:  I did.

18          MR. POLLACK:  I want to show you that that's

19  incorrect.

20          THE COURT:  And because it -- well, the

21  sentence you're quoting from, Mr. Pollack, says the

22  objection alleges that counsel for Ganglu ---

23          MR. POLLACK:  Oh, no, I understand that.

24          Okay.  If we go back to Mr. Lieberman's

25  submission of the proposed order on November 4th, he

1   e-mails Aaron Brownell, and copies a lot of other people,

2   and please find attached proposed order.

3            I didn't get the whole -- let me do this, so

4   I get the entire page.  Well, it's too large to really

5   blow it up, but -- so we've got Lieberman to Brownell,

6   copies to a lot of counsel, please find attached the

7   proposed order, and then this is -- that e-mail is

8   forwarded by Ms. Rodriguez-Taseff to Rebecca Guillou, that

9   says, please send Mr. Brownell our joint stipulation and

10  proposed order, see the e-mail below and do the same thing

11  he did.

12            But because Ms. Brownell is -- excuse me,

13  Ms. Guillou was not on Mr. Lieberman's e-mail, she can't

14  hit reply all, and so -- and so she has to create her own

15  e-mails, and she addresses this in her affidavit.  She,

16  she finds a distribution list in the case somewhere, and

17  remember, Judge, that she is not -- this is another one of

18  the unfortunate circumstances, Dawn Perez, who is the

19  paralegal at Duane Morris in Miami who was doing all of

20  this filing was out, and so she substitutes for her to get

21  this stuff filed, and she creates -- she doesn't have the

22  capacity to hit reply all.  So creates this list of

23  people, which is longer than Mr. Lieberman's list, it

24  includes some people that Lieberman did not include, and

25  fails to include some people Lieberman did include, and

```
 1    also fails to include Lieberman, by the way, but does

 2    include, does -- does copy on the e-mail Mr. Messana and

 3    Mr. Zeichman.

 4              So, it's not like, you know, we -- it's not

 5    like somebody said, well, let's not let the debtors'

 6    counsel know about this, you've got a -- a legal assistant

 7    who is unfamiliar with the lawyers in the case, who can't

 8    hit reply all, who creates a list.  Why she didn't cut and

 9    paste?  You can ask her, she'll tell you, I wish I had, I

10    don't -- I can't remember, and I can't even tell you how I

11    compiled that list, because I -- her affidavit says, I

12    went back and I looked at the files to see if there was an

13    identical list, couldn't find one.  So she creates this

14    list, but if there is any intent to keep this from the

15    debtors, you don't copy Messana and Zeichman.

16              THE COURT:  Well, okay.

17              MR. POLLACK:  All right.  So, I have been

18    jumping around a little bit, but then we get to, later in

19    the day, that Mr. Lieberman submits the amended, the

20    proposed amended agreed order continuing the hearing.

21    Mr. Brownell e-mails Ms. Rodriguez-Taseff, are you

22    submitting a competing order?  Apparently not registering

23    that the stipulation and proposed amended agreed order ---

24              THE COURT:  Which were filed, which were

25    filed as exhibits at ECF 39 in the docket?
```

1          MR. POLLACK:  And e-mailed to him earlier

2    that day.  Remember Rodriguez-Taseff to Guillou, send him

3    the stipulation and order, do it the way Lieberman did it.

4    So that's there already, but Mr. Brownell apparently

5    doesn't put those two together, and wants to know whether

6    the moving party is going to submit a competing order, and

7    that's the resubmit stop and order e-mail that Taseff --

8    Rodriguez-Taseff to Guillou, and then Guillou e-mails

9    Brownell and says, this is our competing order and, again,

10   copies everyone and, again, doesn't include Lieberman.

11          By the way, there is something interesting

12   going on here, which also negates any effort to hide stuff

13   from people.  One of the people she unintentionally

14   omitted from the first e-mail to Mr. Brownell, was

15   Mr. Solomon, who is on the phone.  Someone from his office

16   noticed that and called Ms. Guillou and said, you left off

17   Solomon, you have some others, please add him.  So you see

18   that Solomon, between the morning and the afternoon

19   e-mails, Solomon is now added.

20          So she's trying, she's doing her best to get

21   everybody in here, but -- and she widely circulates to all

22   the lawyers in the case a competing order.  If it's a

23   competing order, by definition it can't be an agreed

24   order.  Again, we're not trying to hide anything.

25          Look, was this smooth?  Is ---

Page 41

1              THE COURT:  What you're telling me,

2    Mr. Pollack, is that there was no malevolence, merely

3    incompetence at multiple levels?

4              MR. POLLACK:  Well, certainly I agree with

5    the first part of that, no malevolence.  I don't know that

6    I would agree that it was -- that there was incompetence.

7              I would certainly admit that there were

8    mistakes that were made, but without intent to mislead

9    anybody and, in fact, Judge, without misleading anybody.

10             I mean, what happened in the event was, the

11   hearing went forward on the 25th and you entered the order

12   you wanted to enter, and I'm not saying that the order to

13   show cause is outcome determinative.  I'm saying that when

14   you add that to what I believe is uncontestable, in good

15   faith, and no purpose to mislead or deceive anybody, I --

16   I cannot but conclude that this contact was not

17   sanctionable.

18             You know, was it laudable?  No.  Was it a

19   paradigm of how you do things?  No.

20             But, again, if I could just kind of ---

21             THE COURT:  Is this how people do things in

22   state court?

23             MR. POLLACK:  I don't think this is a

24   pattern that one sees anywhere.  I think what happened

25   here is unique.

1          I don't, I don't -- I would not suggest that

2    you ought to forgive the conduct, because that's how they

3    practice in state court.  That's not our position at all.

4          Our position is, no intent to mislead, no

5    purpose to deceive anyone.  You have -- and if I can just

6    go back and march through the unfortunate events one by

7    one, the order granting the motion to continue the hearing

8    date omits to say what happens to the stay.  Although, by

9    local rule, the stay remains in effect, Mr. Lieberman, at

10   the October 30th hearing, addresses it anyway.

11          THE COURT:  And one would do so, I expect,

12   when one is dealing with lawyers who don't normally appear

13   in this Court so that there is no, no misunderstanding

14   that 362(e)(2), I guess it is, doesn't, doesn't flow

15   automatically in this Court by local rule, but rather

16   address the point up front so that there shouldn't be any

17   mistake or confusion.

18          MR. POLLACK:  Well ---

19          THE COURT:  Even among those who are not

20   bankruptcy practitioners.

21          MR. POLLACK:  Okay.  Well, Mr. Lieberman can

22   speak for himself.  I don't know why he stood up and said

23   that, but that's unfortunate circumstance number two.

24   Because the stay relief motion was off calendar,

25   Mr. Kotler -- neither Mr. Kotler nor Mr. Di Massa, who

1   would understand that when you agree to continue the

2   hearing, you agree to continue the stay in -- in place,

3   weren't there.

4             Now, maybe Mr. Lieberman is going to tell

5   you, that's why I said it, because they weren't there, or

6   maybe he didn't realize it either, I don't know, but I

7   have no idea why he did, but that's the unfortunate

8   circumstance.  When he said it, Skip Di Massa and

9   Larry Kotler were in Philadelphia, they weren't there to

10  hear it.

11            Then, of course, the biggie, the disconnect,

12  the above the line versus below the line from the

13  transcript, what sunk in and what didn't, and then

14  Ms. Rodriguez-Taseff's having been out of the office when

15  the Lieberman e-mail to Mr. Brownell, with the, with the

16  proposed amended agreed order comes in.  So, she has no

17  ability to respond, because from her iPhone, attachments

18  frequently don't attach.

19            THE COURT:  Is there something in her

20  affidavit that said that her iPhone would not open that

21  attachment?  I don't remember that.

22            MR. POLLACK:  It isn't, but she will tell

23  you that, and she's happy to -- not that it wouldn't, not

24  that it wouldn't open it, but her concern was, if she used

25  her iPhone to respond, the -- and attached -- you know,

1    had to go find and attach their stipulation and proposed

2    agreed order, that's what wouldn't come through, not that

3    she couldn't read what came in.

4                    THE COURT:  I see.

5                    MR. POLLACK:  But she was concerned about

6    that, as I think most people would be, and so she's got to

7    reach out to Ms. Guillou, who can't hit reply all, and so

8    she, you know, compiles a list of lawyers for her e-mail

9    distribution that unintentionally omits, among others,

10   Lieberman and Solomon.  You know, it's one unfortunate

11   circumstance after another.

12                    And, your Honor, I -- you know, I am -- I

13   persuaded, I'm an advocate, of course, but I am persuaded

14   of Ms. Rodriguez-Taseff's good faith in this.

15                    I'm also persuaded that she should have

16   listened better.  I'm also persuaded that she should have

17   gotten the transcript and, and the consequence is what I

18   call, you know, my firm having to subatomically look at,

19   you know, how the e-mail lists on -- copies on one e-mail

20   did or didn't match up with another, look at filing times.

21   I mean, it's, it's -- a lot has gone into an effort to

22   show you that these are unfortunate events.

23                    Are we blameless?  No, of course not, but

24   are we sanctionable?  No.  And here, Judge, I ought to

25   talk about the lawyers other than Ms. Rodriguez-Taseff,

1   because I haven't mentioned them at all.

2                    THE COURT:  From everything I have read, and

3   unless someone persuades me otherwise, or objects, I don't

4   think that we need to address Mr. Vance or Mr. Di Massa,

5   or Mr. Kotler.  They are innocently swept up in this,

6   insofar as I have been able to perceive.

7                    MR. POLLACK:  I appreciate that, Judge.

8                    THE COURT:  What steps has Duane Morris

9   taken in respect of this series of events?

10                   MR. POLLACK:  Someone I have not introduced

11  you to, sitting at counsel table is Michael Silverman, who

12  is Duane Morris' general counsel.  He's from Chicago,

13  where his office is, and might I ask that you address that

14  question to Mr. Silverman?

15                   THE COURT:  Certainly.

16                   MR. POLLACK:  Thank you.

17                   THE COURT:  Mr. Silverman.

18                   MR. SILVERMAN:  Your Honor, good afternoon.

19  Thank you.

20                   In addition to working with Mr. Pollack to

21  identify how this went wrong, and discussing with the

22  individuals involved, including Mr. Di Massa, who is the

23  head of the bankruptcy group in the firm, I have had

24  conversations with the folks in the Miami office where

25  this occurred, particularly the head of the office, to

1  make sure that we're having lawyers communicating better

2  with each other on what's going on when people from out of

3  state are working to support people in state, people in

4  other practice areas are working to support people in

5  different practice areas, as the bankruptcy lawyers were

6  supporting Ms. Rodriguez-Taseff.  We're also going to

7  address within the firm education programs, concepts like

8  the things Ms. Rodriguez suggests she would change about

9  how this occurred.  If there is a disagreement about

10  what's in an agreed order, or what the judge says should

11  be in agreed order, get the transcript.  We constantly

12  talk about not relying only on e-mail, and having

13  conversations with other folks.

14          The management -- this -- the order to show

15  cause was directly right to the chairman of the firm, and

16  has been discussed with the other members of the

17  management of the firm, and I'm going to report back to

18  them on these issues that we've been addressing today.

19          So ---

20          THE COURT:  But prior to today the firm has

21  not taken any steps of a particularized nature?

22          MR. SILVERMAN:  We have, we have had

23  discussions with the folks who are involved in these kinds

24  of transactions down here, where there aren't bankruptcy

25  lawyers, to address those issues, and like I said, Judge,

1    we're working on a training program to address these kinds

2    of things with our personnel.

3              Because I think, your Honor, honestly the

4    biggest issue for us is making sure that when we're before

5    the Court, and we have an order by the Court, we

6    understand what's in the order, and that's the kind of

7    thing that I want to get everybody in the firm to

8    understand, the people who practice in the courts, to

9    understand that they can't just sort of go on their

10   recollection.

11             THE COURT:  Okay.  Thank you.

12             MR. SILVERMAN:  Thank you, Judge.

13             MR. POLLACK:  Your Honor, because I know you

14   know Tim Norris, I feel I should explain that he has taken

15   retirement, he comes to the office sometimes, but he is

16   receding from the practice, and so there is, as

17   Mr. Silverman indicated, no longer any bankruptcy presence

18   within the Miami office.

19             THE COURT:  Then why on earth are you taking

20   -- are they taking cases into the Bankruptcy Court?

21             MR. POLLACK:  Frequently people like

22   Mr. Kotler, Mr. Di Massa and others are, are sought out by

23   clients who have complex bankruptcy issues everywhere --

24             THE COURT:  Uh-huh.

25             MR. POLLACK:  -- for their professional

1    services.

2              One of the things that's so upsetting to the

3    lawyers at the firm about this is that, that Duane Morris

4    practices extensively in the Bankruptcy Courts --

5              THE COURT:  I'm very aware of that fact.

6              MR. POLLACK:  -- across the country.

7              There are something like a dozen former

8    Duane Morris partners who sit as United States Bankruptcy

9    Judges, and it's a firm that prides itself on knowing how

10   to talk to Bankruptcy Courts, and so the amount of ojida

11   that has been visited upon all of the Duane Morris lawyers

12   involved in this order to show cause in the month or so

13   since it has been -- since it was issued is immense, and I

14   have -- that ojida has been shared with me repeatedly, and

15   by each of the four.

16             The one other thing that I would like to say

17   before I ask if now would be the appropriate time to hear

18   from Ms. Rodriguez-Taseff, is a sanction is a -- a

19   sanction from a Court is an awesome penalty, in the

20   original sense of the word, not the way we use it

21   vernacularly today.

22             It is, as the teachers used to threaten us

23   in high school, it's on your permanent record.  It needs

24   to be disclosed whenever you apply for anything, a pro hac

25   vice admission in another jurisdiction, the bar of another

1    state, the bar of a Federal District Court, or a Federal

2    Circuit Court, or even for a legal specialization issued

3    by the Florida Bar.

4                    I profoundly believe that

5    Ms. Rodriguez-Taseff's conduct is not such that a sanction

6    ought to be entered against her, and if I could now have

7    you listen to her directly, I would appreciate that.

8                    THE COURT:  I will certainly do so.

9                    MR. POLLACK:  Thank you, Judge.

10                   THE COURT:  Ms. Rodriguez-Taseff.

11                   MS. RODRIGUEZ-TASEFF:  May it please the

12   Court.  Lida Rodriguez-Taseff from the law firm of

13   Duane Morris.

14                   Judge, first let me begin by saying that I

15   again apologize for the errors that I made that caused

16   this misunderstanding.

17                   I have been practicing law for over

18   23 years, and I have never, ever had my conduct questioned

19   by any Court, and I have never made an error like this

20   before.

21                   I asked my client to be present today and,

22   in fact, he is in the back of the room, the chairman of

23   Ganglu, with a translator, because I wanted him to be here

24   in full disclosure and candor to listen to what the Court

25   had to say.  I believe, I believe that this is punishment

1   enough, and ask the Court to please consider not imposing

2   sanctions.

3            I understand I made mistakes, and I've

4   learned greatly from them, Judge.  I have an unblemished

5   record, and I have gone back, and I've looked at the

6   transcripts, and looked at my e-mail exchanges, and looked

7   at the record in this case so that I could come before the

8   Court and be very, very clear as to my position.

9            Judge, I am sorry, and I apologize to the

10  Court, to counsel, and most importantly to my client,

11  because I made mistakes, and I apologize to the Court, and

12  to counsel, and to my client because I believe that it's

13  my job to apologize, and it's my job when I make a mistake

14  to address it head on.

15           As Mr. Pollack started to discuss, I have

16  looked at what I could have done better, and clearly the

17  first thing I could have done better was pull the

18  transcript after the hearing.  I am not a bankruptcy

19  lawyer.  I'm not used to practicing in Bankruptcy Court.

20           As soon as I heard the Court raise the issue

21  of wanting to hear from the trustee, I really, frankly,

22  Judge, lost focus on everything else that your Honor said,

23  and that ---

24           THE COURT:  Ms. Rodriguez-Taseff, you've

25  been a litigator for more than two decades.  How can you

Case 14-32819-JKO    Doc 224    Filed 02/03/15    Page 51 of 87

1  not wait for the ruling?

2              MS. RODRIGUEZ-TASEFF:  Your Honor, I'm

3  sorry.  I don't know how I couldn't, and you're absolutely

4  correct, and my biggest mistake in having not waited for

5  the ruling, having not focused on the ruling, was that I

6  just -- should have just pulled the transcript and said, I

7  don't really know what happened, I should have just pulled

8  the transcript.  So I apologize.  You're absolutely

9  correct.

10             Usually when we wait for rulings, we sit

11 there with a legal pad, writing down what the Court says,

12 and I don't do that, Judge.  I was standing here, because

13 I didn't expect to be asked to speak.  I was in the back,

14 and when your Honor said Ms. Rodriguez, I came forward.  I

15 didn't have my legal pad with me.  I made my argument.

16 And, your Honor, I did not expect to be asked to speak,

17 and I did not focus on the Court's ruling, I really did

18 not, and I made a mistake in not pulling the transcript.

19             Also, your Honor, I believe that I was

20 communicating extensively by e-mail with Mr. Lieberman,

21 and I think what happened is that we get a little bit over

22 reliant on e-mail.  I should have picked up the phone and

23 called him at various points here where we disagreed with

24 the ruling and sought his counsel on what he recalled, and

25 if I didn't agree, I should have pulled the transcript.

1          So, I apologize for not having called

2    Mr. Lieberman, and had a discussion with him, and

3    especially because he sent me an e-mail after we

4    inadvertently left him off the two e-mails, I immediately

5    responded to him, apologized, and sent him the e-mails

6    that he had been left off of, but I should have picked up

7    the phone and made sure that we were both on the same page

8    as to his understanding that what we were doing was in no

9    way intended to intentionally exclude him.  We made a

10   mistake.  We made a mistake in not including him, and I

11   corrected it within 30 minutes, and I sent him the e-mails

12   that we had sent forward.

13          And, lastly, Judge, as regards to

14   Mr. Brownell, I was out of the office and instructed

15   Ms. Guillou to go ahead and forward the stipulation with

16   the exhibits.

17          Now, I am always very cautious when

18   communicating with Courts not to engage in improper

19   ex parte communications.  So, I've been taught not to

20   provide argumentative detail in a communication with the

21   court when you're forwarding something, but in this case

22   I've gone back and I've looked at the e-mails to

23   Mr. Brownell, and it's obvious to me that we could have

24   added more information so that he could have understood

25   our thinking, without violating the ex parte communication

 1   rule.

 2              Judge, and I think you asked this of

 3   Mr. Pollack regarding submissions of agreed orders when

 4   there are more than -- more parties in the case, and what

 5   I have done in the past is when I'm submitting a proposed

 6   agreed order where it doesn't relate to all the parties in

 7   the case, it doesn't have to be run by all parties in the

 8   case, it needs to be run by the parties who are

 9   implicated.

10              My understanding, Judge, was that it was the

11   trustee's decision.  Once it was made clear by Mr. -- by

12   Mr. Moses that he wanted the order clarified, we clarified

13   it, and we clarified it within three -- no, between noon

14   and 4 p.m., your Honor.  We submitted first one at noon,

15   and the corrected one at 4:46 p.m. on the same day, on

16   November 3rd, just to be abundantly clear that that order

17   was intended to be as between the trustee and Ganglu,

18   and ---

19              THE COURT:  How can you say that?  The order

20   granted stay relief, period, full stop.

21              MS. RODRIGUEZ-TASEFF:  Your Honor, my

22   recollection of what the order says, and I can ---

23              THE COURT:  Granted stay relief in order for

24   the state court to do three things, one, enter the written

25   order, the result of the hearing on October 13th, I think.

Page 54

1              MS. RODRIGUEZ-TASEFF:  Yes, your Honor.

2              THE COURT:  Second, and I can't remember the

3    second one, but ---

4              MS. RODRIGUEZ-TASEFF:  The rat -- the issue

5    of ratification.

6              THE COURT:  And, third, deal with the issue

7    of ratification, and I don't know how in the world you

8    thought that that third part didn't directly affect

9    Wei Chen and Mapuche, and I appreciate your view that,

10   that the debtors, the Chapter 7 debtors did not have

11   standing.  I do not understand how you thought that the

12   issue of ratification could be, could be dealt with in a

13   mere stipulation between you and the trustee.  I don't

14   understand the legal analysis that went behind that.

15             MS. RODRIGUEZ-TASEFF:  Understood, Judge.

16             THE COURT:  No.  Well, you tell me what the

17   legal analysis was.

18             MS. RODRIGUEZ-TASEFF:  As regards Wei Chen?

19             THE COURT:  As regards the ratification

20   issue that clearly implicated Mr. Wei Chen, and implicated

21   Mapuche.

22             MS. RODRIGUEZ-TASEFF:  Your Honor, with

23   regard to Mr. Chen, Mr. Chen is not a party to this

24   bankruptcy.

25             As regards ---

Page 55

1                THE COURT:  What constitutes a party to a

2       bankruptcy, Ms. Rodriguez-Taseff?

3                MS. RODRIGUEZ-TASEFF:  Your Honor, my

4       understanding was that he was not a debtor, he didn't file

5       for bankruptcy, the stay would not have applied to

6       Mr. Chen.  The case in state court could have moved

7       forward if it was purely between Mr. Chen and Ganglu,

8       because the stay did not apply to Mr. Chen.

9                As regard to Mapuche, Mapuche was a debtor

10      in this case, and Mapuche was represented by the trustee,

11      because the trustee steps into the shoes of the debtor.

12      That was my understanding.

13               THE COURT:  So your analysis was that the

14      third step, the ratification step could be, could be

15      undertaken without ever considering the -- or hearing from

16      Mr. Chen or Mapuche's lawyers --

17               MS. RODRIGUEZ-TASEFF:  Your Honor ---

18               THE COURT:  -- that's your view?

19               MS. RODRIGUEZ-TASEFF:  My understanding --

20      yes, your Honor, my understanding was that that -- that

21      because the stay did not apply to Mr. Chen, that the state

22      court could have, and would have moved forward with a

23      ratification issue if, for example, it was purely between

24      Mr. Chen and Ganglu, there would be no stay to be

25      implicated, and the state court would not have been

1   required to stay proceeding on the ratification with

2   regard to Ganglu and Mr. Chen, because Mr. Chen was not

3   subject to the stay.

4                   THE COURT:  So you didn't think you needed

5   to tell Mr. Chen or Mapuche's lawyers that you were going

6   -- that you were submitting an order that would lift the

7   stay on the ratification issue, that's your view?

8                   MS. RODRIGUEZ-TASEFF:  No, your Honor, that

9   is not my view.  The ---

10                  THE COURT:  Well, then why did you?

11                  MS. RODRIGUEZ-TASEFF:  The stipulation was

12  circulated -- was filed for all counsel.

13                  THE COURT:  You gave me an order,

14  Ms. Rodriguez-Taseff that purported to lift the stay on

15  the ratification issue, without circulating that order

16  previously to Mr. Markowitz or Mr. Lieberman, and took the

17  view, apparently, that the stipulation of the trustee on

18  the ratification point was enough.  Sharp practice at

19  best.

20                  MS. RODRIGUEZ-TASEFF:  Understood,

21  your Honor, and I apologize.

22                  THE COURT:  All right.  Anything else you

23  want to tell me?

24                  MS. RODRIGUEZ-TASEFF:  Respectfully,

25  your Honor, I would ask that the Court not impose

Page 57

1    sanctions in this case.

2              THE COURT:  Thank you, Ms. Rodriguez-Taseff.

3              MR. POLLACK:  Your Honor, two points

4    briefly.

5              THE COURT:  Either one, or neither.  You can

6    stand in the middle, I'll hear you.

7              MR. POLLACK:  First, I disagree that what

8    Ms. Rodriguez-Taseff did was sharp practice.  I know that

9    you are focused on her not having circulated the form of

10   order before filing it on PACER, but ---

11             THE COURT:  I'm actually more troubled by

12   the fact that she submitted an order that is directly

13   contrary to the oral ruling, and then exacerbated that

14   problem by not circulating the order previously, so that

15   she wouldn't have submitted it, because if anybody who is

16   acting with professionalism in this situation would either

17   have paid attention to what was going on in Court, and

18   listened to the four lines that constituted the Court's

19   ruling, or circulated the order to everybody who was

20   concerned as a draft order, and said, you got any problems

21   with this?  Instead she did what she did.  But I

22   interrupted you, and I apologize for doing that.

23             MR. POLLACK:  Taking those two issues, I

24   think in the reverse order that you addressed them, or

25   maybe not, the stipulation and it's attached exhibit, the

1    proposed agreed, and then amended agreed order, although

2    not circulated in advance, were filed on PACER and

3    simultaneously e-mailed to all of the other lawyers,

4    anyone of whom could have, and one of whom did, dispute

5    that that was the order and submitted his own order,

6    and ---

7                    THE COURT:  As he had actually been directed

8    to do.

9                    MR. POLLACK:  Yes, correct, I understand.

10                   The other thing, Judge, and maybe this is

11   not done in Bankruptcy Court, but it's certainly done in

12   other Courts, and I've done it myself in other Courts in

13   which I more routinely practice and, in fact, sometimes

14   it's required by court rules, or by particular judges, it

15   is not uncommon for lawyers to submit proposed orders

16   either granting or denying a motion before the hearing on

17   the motion.  It happens in state and federal courts all

18   the time.  If not all the time, certainly it's not

19   uncommon to see it happen.

20                   And I just -- given the self-confessed lack

21   of attention which you may find unforgiveable and, if so,

22   I can't do anything about that, but given the lack of

23   attention, and the misapprehension of what your Honor

24   ruled, I think it inaccurate to characterize what

25   Ms. Rodriguez-Taseff did as sharp practice.  I think sharp

Page 59

```
1   practice has implicit within it an intent to deceive,

2   which I see as entirely absent here.

3                 Thank you.

4                 THE COURT:  Thank you.

5                 THE COURT:  Anything else, Mr. Pollack?

6                 MR. POLLACK:  Thank you, Judge.

7                 Mr. Dillworth reminds me that we requested

8   in our paper that you endorse what we would have done in

9   the natural order of things but for the intervention of

10  the order to show cause, which is permit the withdrawal of

11  -- permit and approve the withdrawal of Duane Morris as

12  counsel for the debtor.  Obviously they couldn't do that

13  because of the optics, once the order to show cause was

14  entered.

15                THE COURT:  Has any, has any such motion

16  been filed to withdraw?

17                MR. POLLACK:  No, and I'm happy to do that,

18  Judge.

19                THE COURT:  Okay.

20                MR. POLLACK:  I'll get that filed tomorrow.

21                THE COURT:  Okay.

22                MR. POLLACK:  Maybe not.  I'm having oral

23  surgery tomorrow.  Early next week.

24                THE COURT:  I'm sorry, I think there are

25  others in this courtroom who probably had their oral
```

1    surgery today.

2                    Does anyone else wish to be heard in

3    connection with this matter, these matters?

4                    Mr. Messana.

5                    MR. MESSANA:  Good afternoon, your Honor.

6                    It was sharp practice when

7    Ms. Rodriguez-Taseff stood up, after Ganglu had agreed to

8    the continuance, and an order had been entered on the

9    28th of October continuing the hearing to the 25th.  It

10   was sharp practice when Ms. Rodriguez-Taseff stood up on

11   the 30th and actually argued against the continuance.  It

12   was gaming the system when she tried to steal an order

13   granting stay relief.  The Court is not aware of certain

14   facts because I was never contacted by counsel for Duane

15   Morris, and I was -- I'm shocked actually, because

16   Mr. Pollack is one of the finest lawyers in the District,

17   so I am shocked that his molecular analysis did not

18   include contacting me, Mr. Lieberman, anyone at my firm,

19   and I know that Mr. Moses, who I contacted, will address

20   the Court after my remarks, who will inform -- and

21   Mr. Moses will inform the Court, as he has me, of

22   additional facts which are not before the Court.

23                    Place this in context.  The parties are

24   involved in hammer and tong litigation in state court.

25                    THE COURT:  And that was my perception at

1  the beginning of these cases.

2          MR. MESSANA:  But at the core of the

3  complaint Ganglu is asking for two things, for the

4  appointment of a neutral to take control of the company,

5  and for the judicial dissolution of the company.

6          So, in filing the Chapter 7, I believed

7  Ganglu achieved both of those items, but obviously I was

8  wrong, because I think rather than inviting Mr. Du to be

9  here in the courtroom today as an embarrassment, it is a

10  marketing piece on behalf of Ms. Rodriguez-Taseff, who is

11  still lead counsel for Ganglu in state court, who is

12  probably the lawyer who brought in Holland & Knight.

13  Holland & Knight appeared before the order to show cause,

14  before the hearing on the 25th, when we learned for the

15  first time that the Court was concerned about the

16  practice.

17          Mr. Lieberman filed the paper that he did

18  because, candidly, he was astonished that after telling a

19  lawyer what he heard in the courtroom, that lawyer kept on

20  coming back, and not with, no, you're wrong, the

21  continuance wasn't granted, but we've gotten stay relief.

22  It just goes to show you you can't take a vacation.

23          THE COURT:  You were looking at elephants.

24  I was looking at the Coliseum.

25          MR. MESSANA:  Were there any elephants in

1    the Coliseum?

2            THE COURT:  There were no elephants in the

3    Coliseum, and the lions were in Fort Lauderdale or Miami.

4            MR. MESSANA:  Your Honor, if you take a look

5    at ECF Number 10, which is Ganglu's stay relief motion,

6    there are five names that appear as counsel for Ganglu,

7    Ms. Rodriguez-Taseff, Mr. Scott Marder, Mr. Rudolph

8    Di Massa and Mr. Lawrence Kotler, and Ms. Nicole Levy.

9            The signature block is that of

10   Ms. Nicole Levy.  Ms. Levy is a 2013 law school graduate.

11   I'm sure that she graduated with distinction.  You don't

12   get a job at Duane Morris if you don't.  So, she was

13   actually the lawyer who signed the pleading because none

14   of the rest of the lawyers qualified under Local

15   Bankruptcy Rule 2090-1.

16           Mr. Di Massa and Mr. Kotler are

17   distinguished bankruptcy lawyers, but they're not members

18   of this Court.  Mr. Marder, who is a member of the U.S.

19   District Court is not a member of the Bankruptcy Court,

20   and Ms. Rodriguez-Taseff is not a member of the Bankruptcy

21   Court.

22           In order to practice before this Court you

23   need to be able to be a member of the U.S. District Court,

24   you need to be familiar with the Local Rules, the

25   Bankruptcy Code, the Bankruptcy Rules and the attendant

1    rules, and you need to take 12 CLE hours in bankruptcy,

2    except that requirement is waived if you haven't been in

3    practice for your full reporting period, three years.

4              So, apparently Ms. Levy was the one lawyer

5    at Duane Morris who could actually fulfill those

6    requirements.

7              Mr. Di Massa and Mr. Kotler's motion for pro

8    hac vice were filed on the 28th, actually, of October,

9    ECF 30 and 31, and they were granted on the 4th of

10   November, ECFs 40 and 41.

11             They weren't admitted to the case when all

12   of these things were going on.  When the matter came up

13   before your Honor on the 30th, Ms. Rodriguez-Taseff

14   addressed this Court.  She is a lawyer.  She's admitted to

15   the U.S. District Court.  She was not qualified to

16   practice before the Court.  If she believed that something

17   unduly prejudicial was going on that would harm her

18   client, the response was, your Honor, I'm a member of the

19   U.S. District Court, but I'm not a bankruptcy lawyer.  I'm

20   not qualified to practice before this Court.  This is

21   unduly prejudicial to me.  I'd ask the Court to have a

22   brief continuance, such that I can consult with my

23   bankruptcy partners in Philadelphia .

24             My guess is that probably would have been

25   granted.

1          What I find astonishing is why they argued

2    at all against what was a routine type request on

3    Mr. Lieberman's part.  The gravamen of the argument as I

4    read the transcript was that this is how -- this three

5    weeks continuance, from, I guess, the 30th through the

6    25th of November, was unduly prejudicial to Ganglu because

7    Ganglu needed to show the order from Judge Tuter

8    concerning the matter that had been concluded on the 13th

9    of October, because it needed to be able to raise money

10   for investors -- and show it to investors to be able to, I

11   guess, make a play towards the assets in this case.

12          It's astonishing that Mr. Du, who is

13   purportedly a billionaire, needs to raise money from

14   investors, Ganglu, a multinational company needs to raise

15   money for investors, but I guess, you know, anyone ---

16          THE COURT:  Other people's money is always

17   advantageous, Mr. Messana, in some people's eyes.

18          MR. MESSANA:  But I would submit that was

19   not unduly -- that a three week continuance is not unduly

20   prejudicial.

21          Ironically, as we stand here today,

22   January 27th, I don't know whether Judge Tuter has entered

23   any order yet.  It's been submitted, Mr. Moses sent it

24   over, that correspondence I've seen, but I don't think

25   there is an order that's been entered yet.  So I don't

1  understand the prejudice, and continuing with the theme of

2  gaming the system, you have lawyers who are not admitted

3  to practice.  You try to find the young lawyer in the firm

4  to file the pleading.  You then address the Court.  If a

5  non-lawyer stood on Ganglu's behalf and argued to you on

6  the 30th, they would have been told to sit down.  When a

7  lawyer stands up, it's presumed they're qualified.  Not

8  being qualified to practice before this Court is

9  indicative, although it's clearly not part of what

10  your Honor put in the order to show cause, it's

11  indicative, or emblematic of the gaming of the system.

12          What is sort of unspoken is, if Ganglu had

13  agreed to the continuance on the front end, as it said,

14  obviously, in the papers, it said in the affidavits of

15  Mr. Di Massa and Ms. Rodriguez-Taseff, what was the

16  change?  Why was Ganglu okay -- so, if the hearing had

17  been continued until the 6th when I had returned, but

18  your Honor had traveled, we -- our vacations overlap, so

19  it was okay to have a continuance for a few days, but it

20  wasn't okay to have a continuance to the 25th.

21          I think, admittedly, we were all unaware of

22  the Court's schedule, but that's just the way it is.

23  Again, unduly prejudicial.  I do not understand what was

24  unduly prejudicial.

25          So Ganglu must have had a representative in

1   Court, and they must have told Ms. Rodriguez-Taseff on the

2   30th to get up and make an argument against the relief, or

3   the housekeeping matter that Mr. Lieberman brought up.

4               I don't believe that they were looking for a

5   gotcha.  I don't believe they were looking for the

6   backdoor for a 362(e), because, as is pointed out by

7   Mr. Pollack, and it's correct, the local rules provide

8   that if you consent to the continuance, you consent to the

9   waiver of 362(e).

10              Ms. Rodriguez-Taseff is a prominent lawyer,

11  that goes unquestioned.  I do not accept, I do not believe

12  that she had a lapse of concentration.  I don't believe

13  that happened.  Of course it happens, but if you have a

14  lapse of concentration, and opposing counsel says, well

15  -- as Mr. Lieberman did on a number of occasions, listen,

16  you got it wrong, the Judge continued the hearing.  You

17  can order the transcript.  You can also call Mr. Moses and

18  say, Mr. Moses, you should -- what happened?

19              I think Mr. Moses was quite aware of what

20  happened.  I think Mr. Moses knew what the import of the

21  trustee's stipulation was.  The trustee's stipulation

22  meant Ganglu and the trustee agreed to the relief Ganglu

23  sought.  Nobody else.

24              When the first -- when the stipulation was

25  first filed on November 3rd, with the original proposed

1    order, Mr. Moses hadn't agreed to that proposed order.

2    So, the agreed order, which was originally filed, was

3    agreed to no one but Ganglu, because there are all these

4    other parties, there is Mr. Solomon's client, there is the

5    unsecured creditors, there is the other equity holder.  So

6    the proposed agreed order that was originally submitted,

7    or attached to the original affidavit, it wasn't agreed at

8    all.

9              Then when certain changes were made to

10   indicate that Wei Chen and Mapuche didn't agree to the

11   order, it should have said, and anybody else, because the

12   other parties hadn't been heard of -- heard from.  It

13   wasn't the submission, the filing of the orders with the

14   Court that Mr. Lieberman was concerned about.  It was just

15   filed with the Court.  It was the fact that they were sent

16   to Mr. Brownell, your law clerk, not under the banner

17   competing order, but proposed agreed order.  That's first

18   what Mr. Lieberman was concerned about.

19             But he wasn't afforded that concern

20   immediately because he wasn't copied on the e-mail.  It

21   wasn't just -- I don't even understand what Mr. Pollack

22   said why Ms. Guillou couldn't file "reply all", I don't

23   understand that, but let's assume that she couldn't, she

24   didn't appropriately copy over the e-mails correctly.  She

25   certainly didn't copy Mr. Lieberman, who was the lawyer

1    who represented Mapuche at the hearing.  It was all well

2    and nice to copy me.  I actually was in Botswana that day,

3    in the Okavango Delta.  There was no Internet.

4                    Mr. Zeichman ---

5                    THE COURT:  That's good to know of the

6    existence of the Internet vel non in the Delta.

7                    MR. MESSANA:  There are actually places you

8    still can get off the grid.

9                    THE COURT:  I find the middle of the

10    Atlantic works, if you're not Ms. Redmond with a sat

11    phone.

12                    (Laughter.)

13                    MR. MESSANA:  Mr. Zeichman was in Court

14    before Judge Streitfeld attending to other matters when he

15    was copied, and it wasn't that he was copied from

16    Ms. Rodriguez-Taseff, a name that he would have

17    recognized.  He was copied from Ms. Guillou, a name that

18    frankly didn't mean anything to him.

19                    It wasn't until later in the day that he --

20    and this is, I guess, November 4th, that he was approached

21    by Mr. Lieberman and said, did you get an e-mail from

22    Ganglu concerning this proposed order?  That he then went

23    to his e-mails and he found out that, in fact, he had, and

24    the only reason Mr. Lieberman knew about it was because

25    Mr. Moses telephoned him.

1            There is an affidavit that says that

2    Mr. Lieberman learned about it from his colleague.

3    Mr. Moses and Mr. Lieberman are colleagues, as we all are

4    before the Court, but I think the spin that was on that

5    affidavit was that Mr. Zeichman told Mr. Lieberman, or

6    perhaps I told Mr. Lieberman, and that's not what

7    happened.

8            What happened is Mr. Moses picked up the

9    phone and said, Brett, you're not on this e-mail.  Did you

10   see this?  And he said, what e-mail?  And rushed back to

11   the office concerned that a proposed agreed order -- look

12   at the Re line on the e-mail from Ms. Guillou to

13   Mr. Brownell.  It doesn't say anything about a competing

14   order, and the reason I say gaming the system is that I

15   believe that Ms. Rodriguez-Taseff used the competing order

16   as her cover to say, oh, it was just the competing order.

17   By the way, Mr. Lieberman was not copied on the second

18   submission.  It really is unexplained how Ms. Guillou did

19   this.  As it is poorly explained that Ms. Rodriguez-Taseff

20   failed to pay attention, or otherwise take proper

21   remediless remedies to make herself aware of what the

22   hearing -- what the ruling at the hearing on November 3rd

23   -- on October 30th was, and let's go one step further.

24   So, she's arguing with Mr. Lieberman about the results of

25   the hearing that she doesn't even correctly understand,

1    because I guess it's an excuse to say, I'm not a

2    bankruptcy lawyer.

3              What also is interesting, when you put

4    together the four affidavits, as stated in Duane Morris'

5    paper, there is a difference of recollection with respect

6    to what Ms. Rodriguez-Taseff reported to her bankruptcy

7    partners about the results of the hearing on the 30th.

8              According to Mr. Kotler and Mr. Di Massa,

9    the report was we -- guess what, we were granted stay

10   relief.  According to Ms. Rodriguez-Taseff it was, we were

11   granted stay relief if the trustee stood with us.

12             Those affidavits stand in stark contrast.

13   They do not harmonize.  It's accepted by Duane Morris that

14   they do not harmonize.

15             I believe that Ms. Taseff was managing her

16   bankruptcy partners.  I don't understand why Mr. Kotler or

17   Mr. Di Massa didn't pick up the phone and call Mr. Moses

18   again once Mr. Lieberman filed his papers saying, this is

19   a preliminary objection to the motion for stay relief, or

20   the proposed stipulation for stay relief.  Again, that

21   would have seemed to have been the prudent course.

22             I actually would have called Mr. Lieberman,

23   the moving party and say, what are you doing?  I spoke to

24   my partner, and my partner tells me we were granted, we

25   were granted stay relief.  That would have short-circuited

1   everything.

2            But I can see not wanting to call opposing

3   counsel, but they had met with Mr. Moses, they had met

4   with the trustee.  Their affidavits say it, there was a

5   working relationship going on.  So why on earth they

6   didn't pick up the phone and ask, I guess it's just left

7   to wonder.

8            I believe Ganglu is probably a major client

9   for Ms. Taseff, lawyers walk -- clients walk into lawyer's

10  office every day and say, listen, I want you to do

11  everything possible to advance my cause.  Lawyers rarely

12  -- clients rarely say it, but what lawyers are supposed to

13  hear when they say that is, within the bounds of the law,

14  and that's not what happened here.

15           Ms. Rodriguez-Taseff did everything possible

16  to advance her client's cause.  She tried to steal an

17  order granting stay relief, and think about how much

18  effort Mr. Lieberman would have had to expend, with me out

19  of office, and trying to get ahold of Judge Ray to explain

20  that this order that had been entered in error was, in

21  fact, not proper, should be vacated.

22           They would have been off to the races.  They

23  would have been back in front of Judge Tuter, and

24  continuing the hammer and tong litigation, which candidly

25  I don't think is necessary because we have a proper

1    fiduciary in front of a Court with a well thought out body

2    of law concerning the dissolution of a company.

3              I do wonder why Mr. Di Massa and Mr. Kotler

4    didn't say, how did we get stay relief at a hearing that

5    wasn't noticed?  What about due process concerns?  I don't

6    understand how Mr. Vance has filing privileges in a court

7    where he doesn't practice, and he's not qualified to

8    practice.  Another one who's not a bankruptcy lawyer, how

9    could you have filing privileges?  Is there a different

10   rule for filing than there is for qualification?

11             I'm not a special prosecutor.  My client is

12   a Chapter 7 debtor.  As I said earlier, counsel for a

13   Chapter 7 debtor, after the schedules have been filed, and

14   after the 341 Meeting, sits by the phone and waits for the

15   trustee to call, and if the trustee doesn't call, I don't

16   really have much of a role going forward.

17             But I am responsible to this Court for

18   myself and the lawyers at my firm.  We did nothing wrong.

19   The suggestion that we did, because it's always being spun

20   just slightly, as good litigators do, that somehow

21   Mr. Lieberman didn't do everything that was expected of

22   him.

23             We don't know when e-orders are filed or

24   not.  We don't know what system they're using, and when

25   you're not copied on the e-mail to Mr. Brownell, you don't

1   even know that it's submitted that way.

2              We did not have an objection to the trustee

3   having entered into a stipulation, and then attaching an

4   accurate proposed order in the file.  It would have stayed

5   there.  It was the fact that they tried to sneak it in

6   through a proposed order that did not correctly indicate

7   that it was a competing order until they were caught where

8   our objection lies, and there was no way for us to know

9   about it, and the suggestion that somehow Mr. Lieberman

10  didn't copy Mr. Di Massa and Mr. Kotler is without moment

11  because, candidly, they weren't even admitted into the

12  Court.  They weren't copied by their own counsel.

13             We didn't do anything wrong, your Honor.

14  Ms. Rodriguez-Taseff has.  There is some sloppiness with

15  respect to the other counsel.  I believe that you can

16  handle that.  It's not for me to say what the appropriate

17  response from the Court is, it's not my order to show

18  cause, it's yours.

19             So, unless you have any questions, I'll take

20  my seat.

21             THE COURT:  Thank you.

22             MR. MESSANA:  Thank you.

23             THE COURT:  Mr. Moses.

24             MR. MOSES:  Thank you, your Honor.  Just a

25  few brief points.

1          First, from the trustee's perspective, I

2    want to discuss the purpose of the stipulation.  Early in

3    the case we had reviewed and considered Ganglu's motion

4    for stay relief.  We were also very aware of the

5    contentious prepetition and shareholder disputes that

6    would undoubtedly spill itself over into this Court.

7          One of the issues that we wanted to avoid

8    and eliminate was the cost and delay associated with a

9    motion to dismiss this bankruptcy proceeding for lack of

10   corporate authority.  We did not believe that that was in

11   the best interest of creditors, or this estate to have

12   that dealt with unnecessarily.

13         We -- from our perspective, the relief

14   sought in the motion for stay relief was more of a Mapuche

15   and Chen issue, including the ratification issue, and so

16   the trustee suggested in the stipulation what the trustee

17   would agree to, knowing full well that the debtors and

18   Mr. Chen would address, appropriately, the issues raised

19   in the motion for stay relief, and so we made that

20   position known in a stipulation, which also eliminated a

21   significant issue for this estate in the trustee's

22   perspective.

23         And so the purpose of the filing of the

24   stipulation, at least from our viewpoint, and our vantage

25   point, was simply to formally advise the Court and the

1    parties as to what was agreed to solely by the trustee in

2    the form of order that solely the trustee would be

3    agreeable to once the Court held a hearing on

4    November 25th, and once the Court heard from all the

5    parties, including Mapuche and Mr. Chen.

6                Now, the point that I feel duty bound to

7    advise the Court is that we did inform Ms. Rodriguez that

8    it was highly unlikely that your Honor would enter any

9    order, irrespective of our stipulation, prior to the

10   hearing on November 25th without, obviously, hearing from

11   the parties impacted in the motion for stay relief.

12               With respect to the submissions to the

13   Court, Mr. Messana accurately points out that I noticed in

14   the e-mail submissions by Ms. Guillou that Mr. Lieberman

15   was not copied on those e-mails.  First, in respect of the

16   submission of the proposed competing order on the

17   continuation of the stay, and then I looked down at the

18   earlier e-mail where they submitted the stipulation, and

19   noticed also that Mr. Lieberman was not copied on that.

20   We knew that Mr. Messana was away on safari, so I picked

21   up the phone, called Mr. Lieberman, asked him if he saw

22   it.  He said, no, I didn't, and I forwarded the e-mails,

23   and then the rest is history from there.

24               Those are the two brief points I wanted to

25   make to your Honor.

Page 76

1            THE COURT:  Thank you.

2            Does anyone else wish to be heard before I

3  hear from Mr. Pollack again?

4            (No verbal response.)

5            THE COURT:  All right.  Anything else,

6  Mr. Pollack?

7            Oh, Mr. Dillworth.

8            MR. DILLWORTH:  Your Honor, you'll hear from

9  Mr. Pollack in a moment.

10            Judge, you may find this unimportant, but to

11  the extent the two comments about our inquiry into this

12  matter by Mr. Messana have relevance, your Honor, I want

13  to just make a brief point.

14            I did engage Mr. Messana on Friday after our

15  papers were filed in the case, and I just believe he

16  forgot about that conversation.  Maybe he's criticizing me

17  about the timing of that telephone call.  In any event,

18  there was a discussion.  I'm a partner of Mr. Pollack's.

19  I've been working on this case, and at the time

20  Mr. Messana, fairly, hadn't yet to read our papers, and my

21  perception is we would have spoken before this hearing,

22  but as events unfolded, that didn't happen.  I wanted to

23  correct the record on that.

24            I also had a similar conversation with

25  Mr. Moses, to the extent, and again, it's relevant to the

1    Court.

2                    THE COURT:  Thank you, Mr. Dillworth.

3                    MR. POLLACK:  Your Honor, I will be brief.

4                    I was surprised to hear Mr. Messana assert

5    that he's not a special prosecutor after he gave you a

6    20 minute special prosecutor's brief, which I believe, and

7    I use that phrase advisedly, because Mr. Messana peppered

8    his remarks to your Honor with, I believe this about

9    Ms. Rodriguez-Taseff, and I believe that about her, all of

10   which I think your Honor ought ignore, because

11   Mr. Messana's beliefs are not what's at issue on this

12   order to show cause hearing.

13                   The context of Mr. Messana's remarks, I

14   think, is the same context that he mentioned twice, hammer

15   and tong litigation.  I think it's a continuation of the

16   very contentious underlying dispute between Mr. Du and

17   Mr. Chen, and their respective companies, Ganglu and --

18   well, I guess it's up in the air who controls Mapuche.

19                   One of the things that Mr. Messana found

20   surprising is that when Mr. Lieberman, whose explaining to

21   Ms. Rodriguez-Taseff that, no, that's not what happened,

22   the Judge continued the hearing and continued the stay,

23   she didn't just say, as Mr. Messana argued, but we got

24   stay relief.  She did disagree with him, even through

25   Mr. Messana said she didn't, and here is her November,

1  November 3 e-mail to Mr. Lieberman:  Brett, based on the

2  Judge's pronouncements at last weeks hearing relating to

3  the lifting of the stay, and the Judge's request to the

4  trustee to provide the trustee's position on the lifting

5  of the stay, and that's just her incorrect mindset,

6  your Honor, we do not agree with your proposed amended

7  order.  She's saying, I understood it differently.  She's

8  not just saying we got stay relief.  She is engaging him.

9  It's inaccurate to say, to characterize what

10  Ms. Rodriguez' communications with Mr. Lieberman were the

11  way Mr. Messana did.

12            It's also, I think, inappropriate for

13  Mr. Messana to have criticized the argument

14  Ms. Rodriguez-Taseff made at the October 30th hearing,

15  because that's not a subject of the order to show cause.

16  It's piling on.

17            Similarly I think the statement that Mr. Du

18  is a billionaire was made for effect, it has nothing to do

19  with this hearing.

20            The phrase competing order was first used by

21  Mr. Brownell.  He asked Ms. Rodriguez whether she had a

22  competing order to submit, and then when Ms. Guillou

23  responded, she said, here is our competing order.

24            And finally on the subject of the e-mail

25  distribution list on Ms. Guillou's e-mails, I think

```
1   your Honor understands why Ms. Guillou could not hit reply

2   all, it's because she was not a recipient of either

3   Mr. Lieberman's e-mail, or of Mr. Brownell's e-mail.  If

4   she had hit reply all ---

5             THE COURT:  It would have gone simply to

6   Ms. Rodriguez-Taseff.

7             MR. POLLACK:  Exactly, exactly, and the --

8   I'm not sure where the argument comes from that we

9   criticized Mr. Lieberman and believe that he was

10  responsible for some, some of this lack of understanding,

11  and I think all we did was explain the context of the

12  communications between Ms. Rodriguez-Taseff and

13  Mr. Lieberman.

14            And weirdly Mr. Messana ended, we didn't do

15  anything wrong, as if he were the subject of the -- or his

16  firm were the subject of the order to show cause.  It

17  clearly is not, and that's not where the focus should be.

18            I know your Honor is intensely focused on

19  what the order to show cause does say.  I hope that

20  your Honor -- well, and I know your Honor has understood

21  everything that we have submitted on paper, and everything

22  that I have attempted to communicate today, and I will say

23  one final time, because I believe it's worth saying one

24  final time, I believe that sanctions against

25  Ms. Rodriguez-Taseff would not be proper, and in that
```

Page 80

1   regard I rely on the papers on the law on sanctions,

2   Judge, which I know you're familiar with, but I believe in

3   order to enter sanctions in accordance with the law that

4   we've cited, your Honor needs to find bad faith or a

5   purpose to deceive, both of which I believe are lacking on

6   this record.

7                 THE COURT:  Thank you, Mr. Pollack.

8                 Anyone else?

9                 (No verbal response.)

10                THE COURT:  All right.  I'll take a short

11  break.  You can keep your seats.  I'll be back as soon as

12  I can be.

13                Thank you.

14                (Thereupon, a recess was had, after which

15  the following proceedings were had:)

16                ECRO:  All rise.

17                THE COURT:  Thank you.  Please be

18  seated.

19                This case was filed on October 17th, I

20  believe, or October 14 -- was it October 14th?

21                MR. POLLACK:  Yes.

22                THE COURT:  14th.

23                Immediately on the heels of a highly

24  contentious state court proceeding in which Judge Tuter

25  reached conclusions as to whether Mr. Du had or had not

1    signed a particular document, he concluded that Mr. Du had

2    not.

3            The litigation was hot and heavy, had gone

4    on for an extended period of time, and was --

5    bare-knuckled may not be the right term, but it's

6    directionally correct, and so when this bankruptcy was

7    filed the day after Judge Tuter's oral ruling, things

8    were hot and heavy in the case, and I had a perception

9    from the very first hearing I had that this case had the

10   potential to get out of control, and that's something that

11   those of you who practice here know I am loathed to

12   permit.

13           A significant part of Duane Morris's

14   argument today is that everything was fine because no

15   orders were uploaded in e-orders, and nothing untoward was

16   done, that while documents should have been circulated in

17   a better way, that there was no ill-intent, and certainly

18   there was no attempt to game the system by uploading an

19   order inconsistent with what I had ruled at the hearing on

20   October 30th.

21           The fact of the matter is, however, looking

22   at the e-orders transaction report generated today for the

23   relevant time period, discloses that Kevin Vance uploaded

24   an order into our e-orders box on November 3rd, 2014 at

25   14:56:40.  It is an order styled amended agreed order

1    granting, et cetera, et cetera, et cetera, stay relief,

2    and granting the complete relief that was sought by

3    Ganglu.

4              It was represented to me today, and in the

5    affidavits, that nothing was uploaded in e-orders.  That's

6    false.

7              I don't blame you, Mr. Pollack.  I blame

8    somebody at Duane Morris for not telling you that

9    Mr. Vance uploaded such an order on November 3rd at

10   2:56:40, and that it was not attached to an e-mail to

11   anyone in Chambers.  It was not identified as a

12   competing order.  It was simply uploaded as an agreed

13   order.  It was not an agreed order.  It was, in fact,

14   directly contrary to the order which I had directed be

15   entered at the hearing on October 30th.

16             Mr. Vance, I'm told, had little to do with

17   the preparation of that document, Ms. Ros --

18   Ms. Rodriguez-Tasoff -- Taseff did, and somehow

19   mysteriously Mr. Vance uploaded it the day before the firm

20   represented they had done so.

21             That's one of the things that bothers me

22   perhaps the most, because after entering the order to show

23   cause two months ago, and a great deal of stuff,

24   everything was minutely examined -- Mr. Pollack, I can't

25   blame you for not having access to the Court's e-orders

1    transmission transaction report, but I can tell you that

2    somebody in your client lied to you.

3              What offends me the most about this, a

4    23-year lawyer who comes into Court pays no attention to

5    the ruling of the Court, submits an order that is

6    directly contrary to the ruling, and submits it in a

7    way that was calculated and designed to be entered

8    without an opportunity by anyone on the other side to

9    review it.

10             I regard that as bad conduct.  I regard

11   it as a complete lack of professionalism, and I regard

12   the, frankly, false testimony that's been given to me

13   with respect to when orders were uploaded, and the

14   manner in which they were provided to the Court, is

15   indicative of a practice methodology for which Duane

16   Morris, a very distinguished law firm, should be

17   ashamed.

18             So, two months ago I entered the order to

19   show cause.  What has Duane Morris done in the interim?

20   They're working on a training program.  They're telling

21   their lawyers they should pay attention to what judges say

22   in Court.

23             As of 4:01 this afternoon the Duane Morris

24   website shows that Ms. Rodriguez-Taseff is still a member

25   of the firm's governing partners board.   The firm has

1    applied no discipline to her about which I have been

2    informed, has adopted no procedures to make sure that

3    matters like this do not occur again.  The firm, in short,

4    has done nothing.  It has not volunteered to provide pro

5    bono services.  It has not made contributions to

6    organizations which provide pro bono services.  It has, by

7    all appearances, applied no discipline to

8    Ms. Rodriguez-Taseff.  I am offended by that.  I'm

9    offended that the order that was submitted was sneakily

10   submitted in a manner calculated to deceive.  It was

11   directly contrary to the Court's ruling.  It was submitted

12   as agreed when it was not, and it was not circulated

13   beforehand to the lawyers who cared.

14            As I said earlier, I can perceive no good

15   reason why Mr. Kotler and Mr. Di Massa should be

16   sanctioned here.  I think the firm needs to consider

17   whether it wants to have a bankruptcy practice, in which

18   lawyers participate who are not qualified to do so, or

19   competent to do so, but I am happy to discharge the

20   order to show cause in respect of Mr. Di Massa and

21   Mr. Kotler.

22            I would like some explanation for how it is

23   that Mr. Vance, who is apparently not qualified to

24   practice in this Court, has CM/EC filing privileges, and

25   how it is that he filed, or uploaded this amended agreed

1    order on November 3rd at 2:56:40 in the afternoon, and

2    didn't tell us about that, but I'm going to leave that

3    question for another day.

4              As for Ms. Rodriguez-Taseff, I find that her

5    conduct completely warrants the imposition of sanctions.

6    She's suspended from the practice of law in the Bankruptcy

7    Court for the Southern District of Florida.  She may

8    reapply for admission to practice, or for the lifting of

9    the suspension any time after April 30th, 2015, upon the

10   proof that she has attended no less than 30 hours of

11   continuing legal education in professional ethics and

12   professional responsibility, such ethics training to be

13   had in person, and not by tape or other not in-person

14   means.

15             As I said, this case struck me at the

16   beginning that it was out of hand, out of control, and

17   certainly Ms. Rodriguez-Taseff was.

18             Unless there is anything else to do this

19   afternoon, we're adjourned.  I will keep the matters with

20   respect to Mr. Vance under consideration, and invite

21   Duane Morris to explain how it is that he submitted

22   the order he did, when he did, without telling us about

23   it.

24             MR. POLLACK:  Thank you, your Honor.

25             Do you have a timeframe in mind for that

Page 86

1    submission?

2                    THE COURT:  Whenever you'd like.  File it,

3    circulate it, and get a time for a hearing from my

4    courtroom deputy.

5                    MR. POLLACK:  Will do.

6                    THE COURT:  Thank you.

7                    Anything else?

8                    (No verbal response.)

9                    THE COURT:  I'll enter an order.  We're

10   adjourned.

11                   Oh, Ms. Rodriguez-Taseff, do you have

12   something to say?

13                   MS. RODRIGUEZ-TASEFF:  No, Judge.

14                   THE COURT:  Thank you.  We're

15   adjourned.

16

17

18                   (Thereupon, the hearing was concluded.)

19

20

21

22

23

24

25

Page 87

1

2

3                        CERTIFICATION

4

5   STATE OF FLORIDA        :

6   COUNTY OF MIAMI-DADE    :

7

8                   I, Cheryl L. Jenkins, RPR, RMR, Shorthand

9   Reporter and Notary Public in and for the State of Florida

10  at Large, do hereby certify that the foregoing proceedings

11  were transcribed by me from an audio recording held on the

12  date and from the place as stated in the caption hereto on

13  Page 1 to the best of my ability.

14                   WITNESS my hand this 2nd day of February,

15  2015.

16

17

18          _____

19          CHERYL L. JENKINS, RPR, RMR

20          Court Reporter and Notary Public
          in and for the State of Florida at Large
21               Commission #FF064003
                December 27, 2017

22

23

24

25