1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF FLORIDA
2

3    IN RE:                     CASE NO. 14-32819-JKO

4    US CAPITAL/FASHION MALL, LLC,

5               Debtor.
     _____/
6    IN RE:                     CASE NO. 14-32822-JKO

7    US CAPITAL HOLDINGS, LLC,

8               Debtor.
     _____/
9    IN RE:                     CASE NO. 14-32827-JKO

10   MAPUCHE, LLC,

11              Debtor.
     _____/
12                    ECF #177 207 (14-32819)

13                      February 12, 2015

14

15              The above-entitled cause came on for hearing

16   before the Honorable JOHN K. OLSON, one of the Judges in

17   the UNITED STATES BANKRUPTCY COURT, in and for the

18   SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

19   Fort Lauderdale, Broward County, Florida on February 12,

20   2015, commencing at or about 1:30 p.m., and the following

21   proceedings were had.

22

23

24              Transcribed from a digital recording by:
                     Cheryl L. Jenkins, RPR, RMR
25

Page 2

APPEARANCES:

KENNETH A. WELT, Trustee


GENOVESE JOBLOVE & BATTISTA, by
GLENN D. MOSES, Esquire
MICHAEL SCHUSTER, Esquire
On behalf of the Trustee


MESSANA LAW FIRM, by
BRETT LIEBERMAN, Esquire
On behalf of the debtors


BRINKLEY MORGAN, by
MARK LEVY, Esquire
On behalf of the City of Plantation


HOLLAND & KNIGHT, by
JOSE CASAL, Esquire
MICHAEL ROTHENBERG, Esquire
On behalf of Tangshan Ganglu Iron & Steel


GRAY ROBINSON, by
STEVEN SOLOMON, Esquire
On behalf of BCEGI, LLC and GHJ Construction


MARKOWITZ RINGEL TRUSTY + HARTOG, by
JERRY MARKOWITZ, Esquire
On behalf of Wei Chen

1

2                     Continued Appearances

3

4                 RICHARD BERMAN, Esquire
                  On behalf of Wei Chen

5

6                 GREENSPOON MARDER, by
                  CHAD S. PAIVA, Esquire
          On behalf of RAM Realty Acquisitions, LLC

7

8                 CARL KITCHNER, Esquire
          On behalf of Broward Records Taxes and Treasury

9

10              JONES LAW OFFICE, P.A., by
                  JASON JONES, Esquire
11          On behalf of Caddell Construction Co, LLC

12

13                DESOUZA LAW, P.A., by
                  DANIEL DESOUZA, Esquire
                  On behalf of the Firm

14

15                IVAN REICH, Esquire
                  On behalf of the Trustee

16

17        DAMARIS D. ROSICH-SCHWARTZ, Staff Attorney
                  Office of the U.S. Trustee
18                Department of Justice

19

                     ALSO PRESENT

20

21                     Yenon Du

22                     Wei Chen

23        ECRO - Electronic Court Reporting Operator

24
                     - - - - - - -
25

1          ECRO:  All rise.

2          THE COURT:  Thank you.  Please be seated.

3          Good afternoon to you all, and my apologies

4   that our technical difficulties kept us from starting on

5   time.

6          In US Capital Fashion Mall, let me take

7   appearances, please.

8          MR. MOSES:  Good afternoon, your Honor.

9   Glenn Moses and Michael Schuster of Genovese Joblove &

10  Battista on behalf of Kenneth A. Welt, the Chapter 7

11  trustee, and Mr. Welt is in Court, too.

12         MR. WELT:  Good after ---

13         THE COURT:  Thank you very much.

14         MR. WELT:  Good afternoon, your Honor.

15         THE COURT:  Good afternoon to all of you.

16         MR. CASAL:  Good afternoon, your Honor.

17  Jose Casal and Michael Rothenberg of Holland & Knight on

18  behalf of Tangshan Ganglu Iron & Steel Company, Limited.

19  With me with the Court -- in the Court today is Yenon Du,

20  with a power of attorney on behalf of Tangshan.

21         THE COURT:  Thank you.

22         MR. LIEBERMAN:  Good afternoon, your Honor.

23  Brett Lieberman of Messana, P.A. on behalf of the debtors.

24         THE COURT:  Thank you, Mr. Lieberman.

25         MR. MARKOWITZ:  Good afternoon, your Honor.

1  Jerry Markowitz for Wei Chen.  He is also in the courtroom

2  today.

3          THE COURT:  Thank you.

4          MR. BERMAN:  Richard Berman, your Honor,

5  also for Wei Chen.

6          THE COURT:  Thank you, Mr. Berman.

7          MR. BERMAN:  Thank you, sir.

8          MS. ROSICH-SCHWARTZ:  Good afternoon,

9  your Honor.  Damaris Rosich-Schwartz on behalf of the

10  United States Trustee.

11          THE COURT:  Thank you, Ms. Rosich-Schwartz.

12          MR. SOLOMON:  Good afternoon, your Honor,

13  Steven Solomon from Gray Robinson on behalf of GHJ

14  Construction, Inc., the largest secured creditor in this

15  case, and also the general contractor.  Thank you.

16          THE COURT:  Thank you, Mr. Solomon.

17          MR. PAIVA:  Good afternoon, your Honor.

18  Chad Paiva for RAM Realty Acquisitions, the proposed

19  stalking horse buyer.

20          THE COURT:  Thank you, Mr. Paiva.

21          MR. KITCHNER:  Good afternoon, your Honor.

22  Carl Kitchner, Broward County Records Taxes and Treasury.

23          THE COURT:  Thank you, Mr. Kitchner.

24          MR. JONES:  Good afternoon, your Honor.

25  Jason Jones, Jones Law Office, P.A., on behalf of Caddell

1   Construction Company, LLC.  They were the primary

2   subcontractor on the project.

3               THE COURT:  Thank you, Mr. Jones.

4               MR. LEVY:  Good afternoon, your Honor.

5   Mark Levy from Brinkley Morgan on behalf of the City of

6   Plantation.

7               THE COURT:  Thank you, Mr. Levy.

8               MR. DeSOUZA:  And good morning, your Honor.

9   Daniel DeSouza of DeSouza Law.  I was former trial counsel

10  for debtor Mapuche, and I'm also a creditor.

11              THE WITNESS:  Thank you, Mr. DeSouza.

12              And on the line, Mr. Reich, are you with us?

13              MR. REICH:  I'm here, your Honor.  I was

14  just going to listen, but I'm not appearing.

15              THE COURT:  All right.  Thank you.

16              And Ms. Gerson, are you with us?

17              (No verbal response.)

18              THE COURT:  All right.  Not.

19              Is there anybody else on the line who would

20  like to make an appearance?

21              (No verbal response.)

22              THE COURT:  All right.  There are two

23  competing matters before the Court this morning, or this

24  afternoon, rather.  One is Ganglu's motion for entry of an

25  order converting the case to a Chapter 11 case.  That's at

1   ECF 177.  Mr. Welt has filed an objection to that at ECF

2   234.  Mr. Wei Chen has filed an objection to that at ECF

3   235.  The City of Plantation has filed an opposition to

4   that at ECF 236.  Caddell Construction has filed an

5   objection to that at ECF 237.  GHJ Construction has filed

6   an objection at ECF 238, and DeSouza Law, P.A. has filed

7   an objection at ECF 241.  Ganglu has filed a notice of

8   filing of supplemental documents at ECF 242, and has

9   yesterday filed a notice of the posting of a $10 million

10  deposit with Holland & Knight.

11            The other matter is the motion for entry of

12  an order by -- filed by the trustee at ECF 207 seeking

13  authority to schedule an auction sale, and approving

14  various terms in connection with that, a notice of filing

15  of exhibits to the asset purchase agreement at ECF 230,

16  and an objection to that filed by Ganglu at ECF 239.

17            Have I missed anything that's -- that I --

18  that is relevant as a filing to this afternoon's hearing,

19  Mr. Moses?

20            MR. MOSES:  I think you covered all the

21  filings, your Honor.

22            THE COURT:  All right.  How shall we

23  proceed, sir?

24            MR. MOSES:  Your Honor, I believe logically

25  it would make sense to hear the motion to convert the case

1   to Chapter 11 first.  Obviously if that's granted, that

2   will necessarily moot our sale process.

3                    THE COURT:  All right.  Let me proceed with

4   that then.  Mr. Casal.

5                    MR. CASAL:  Thank you, your Honor.  Good

6   afternoon.  Jose Casal on behalf of Ganglu.

7                    Your Honor, I think the Court, since it has

8   complete discretion on whether to permit the conversion of

9   this case to Chapter 11, has 10 million reasons why it

10   should, or it could.

11                    This is an effort by the 99 percent member

12   of the parent debtor in this case, Mapuche, to retain its

13   interest while paying all allowed claims in full, that is

14   what is going to be proposed by Ganglu, whether as an

15   equity holder, or in conjunction with a joint plan with

16   the Chapter 11 trustee.

17                    THE COURT:  I'll probably interrupt you,

18   just to make your stream of conscientiousness more

19   difficult for you, Mr. Casal, but you say the 99 percent

20   owner.  I have seen pleadings that say 80 to 90 percent

21   owner, including some filed on behalf of your client.  How

22   did we get from 80 to 99?

23                    MR. CASAL:  Well, first of all it's always

24   been 99, as in the two thousand ---

25                    THE COURT:  Always?

1          MR. CASAL:  In the 2012 bankruptcy.

2          THE COURT:  Okay.

3          MR. CASAL:  Which was acknowledged by the

4    subsidiary debtors, and its counsel, and in the documents

5    signed by Mr. Wei Chen, that it was -- that my client was

6    the 99 percent member of Mapuche.

7          Any argument that Mr. Chen has a 20 percent

8    interest precedes or pre-dates that bankruptcy.

9          THE COURT:  Okay.

10         MR. CASAL:  But, again, I don't want to get

11   distracted on whether it's 80 or 99 percent, because the

12   issue here is my client is someone with a very significant

13   stake in this debtor, and in this property, and is trying

14   to protect and preserve that interest, and after analyzing

15   this case, and looking at the various schedules, claims,

16   what the Chapter 7 trustee is trying to do, my client,

17   Ganglu, came to the conclusion that the only way that it

18   would have a chance to at least recover a substantial

19   portion of its investment was to have this case converted,

20   file a plan, get it confirmed, and then proceed with the

21   redevelopment of this property, which is something that is

22   sorely needed in the City of Plantation.

23         THE COURT:  Why did it conclude that that

24   was the only way it could protect its interests?

25         MR. CASAL:  Ganglu does not believe,

1   your Honor, that a Chapter 7, with a 363 sale process,

2   will result in a sufficient, or adequate enough of a

3   return, or at least excess proceeds to pay off the equity

4   holders.

5               Now, the argument to that is, well, why

6   don't you just become a qualified bidder, put in your

7   deposit, become a qualified bidder, and then bid the

8   requisite amount --

9               THE COURT:  The question ---

10              MR. CASAL:  -- plus the overage.

11              THE COURT:  The question has occurred to

12  others in the courtroom.

13              MR. CASAL:  And so the problem with that,

14  your Honor, is why should my client be required to compete

15  against itself, when anything after, by our estimates,

16  $24 million, is going to belong 99 percent to my client.

17  In other words, why should this Court, and why should the

18  Code be used to force my client to bid against itself,

19  against third parties or outsiders, who have a legitimate

20  -- you know, who have a reason to want to develop this

21  property over my client's objections?

22              My client is the 99 percent owner of this

23  property, and so it should -- that should be recognized,

24  and to the extent that it's willing and able to step up to

25  the plate and put enough money on the table so that

Page 11

1    everybody gets paid, why should a two party dispute

2    between my client and Mr. Chen result in an open-ended

3    bidding, and a sale of my client's property.

4              THE COURT:  Well, if you're right, then

5    anything above $24 million -- 99 percent of anything above

6    $24 million goes right back in your client's pocket, I'm

7    lost in the logic of why that's harmful to your client.

8              MR. CASAL:  It's harmful for my client

9    because my client will not be able to realize a greater

10   return on this property, which it believes it can if it's

11   allowed to redevelop the property with a joint venture

12   partner, who is an experienced U.S. developer, and has the

13   capabilities of turning this project around, putting

14   together a mixed use project of multi-family housing,

15   retail and office, and we understand that it's a difficult

16   task, it's going to be a difficult road with the City of

17   Plantation, because they're going to -- the City of

18   Plantation obviously has its doubts and uncertainties,

19   which have been created over the last 10 years through

20   inaction by Mr. Chen or the failures ---

21             THE COURT:  Inaction by Ganglu.  If you're

22   right that Ganglu is the 99 percent owner, this property

23   was severely damaged in Hurricane Wilma in 2005, has been

24   shut down by the city for more than nine years as we sit

25   here today.

1                What -- where has your client been for the

2    last nine years?

3                MR. CASAL:  Trusting Mr. Chen, your Honor,

4    that's where it's been, and unfortunately, yes, it is an

5    absentee client, it is an absentee investor, it is someone

6    that didn't follow through on its cash infusions in this

7    investment, but because it -- it shouldn't be penalized

8    because now it is here, it is here through counsel, it is

9    here through professionals.  As we indicated in our

10   supplemental filing, Ganglu retained Mr. Andrew Hellinger,

11   who is, I believe, known by most of the people in this

12   courtroom, he not only has significant bankruptcy

13   experience, but also obviously has significant real estate

14   development experience in the various projects that he's

15   involved in, and it is Mr. Hellinger who has been

16   assisting and guiding Ganglu with regard to its

17   negotiations with very significant and real joint venture

18   partners, and Mr. Hellinger just advised me today that

19   we're very, very close with respect to at least two of the

20   three prospects that we've been discussing with, that

21   we're very close to reaching terms on a term sheet for the

22   joint venture.

23                So all the pieces are in place for a

24   situation where my client is going to be able to put up

25   the remainder of the money that's needed in order to

1    confirm a plan, get the plan confirmed, and then proceed

2    with a redevelopment project before the city, the City of

3    Plantation.

4            You know, just if I can just deviate for a

5    second with regard to the City of Plantation, because I do

6    think, respectfully, your Honor, of all the people here,

7    of all of the entities here, of all the parties in

8    interest here, the City of Plantation is the one party of

9    interest that I think has the biggest concern and should

10   be heard.

11           The City of Plantation and its residents

12   have waited too long for this property to be redeveloped.

13   The reality is, however, that whether we go Chapter 11 or

14   Chapter 7, they're going to wait the same amount of time.

15   Whether it's a Chapter 7 363 sale, where you have a

16   qualified bidder who is going to come in, an outsider, and

17   is going to bid, and is going to win the -- and is going

18   to be the successful bidder and get title to the property,

19   they still have to go through the same land use process,

20   site approval, site plan approval process that Ganglu and

21   its joint venture is going to have to go through.

22           THE COURT:  That -- why is that factor

23   anything but neutral?

24           MR. CASAL:  That's my point.  I think

25   it's ---

1                    THE COURT:  Okay.

2                    MR. CASAL:  I think it's a completely

3    neutral point, but it is a point that the city has made,

4    and others have made, that some how, some way, that if

5    Ganglu and its joint venture partner is left with the role

6    of being the redeveloper of this property, that somehow

7    it's going to take longer than a purchaser under 363,

8    which by the way, there is no guarantee that anyone who is

9    the successful purchaser under 363 is going to redevelop

10   this property.  They could be a speculator for all we

11   know.

12                   So these are things that I can't predict,

13   the Court can't predict, no one can predict, but what I

14   can say is that my client is ready, willing and able to

15   proceed with confirmation if this case is converted, and

16   it's ready, willing and able to redevelop this property.

17                   I asked one thing of my client, I asked my

18   client, I want $10 million in my trust account before this

19   hearing, and they did it, and I've presented that to the

20   Court, and I think that speaks volumes of my client's good

21   faith, and interest, and desire to move forward in this

22   case.

23                   What are some of the equities, that's going

24   back to the situation as to, because the Court has such

25   wide latitude and discretion as to whether to convert the

1    case to Chapter 11.  What are some of the equities in

2    favor of Ganglu, at least with respect to whether to

3    convert?  One, Ganglu has invested more than $160 million

4    in this project since 2004.  That is an astronomical

5    number.  It's a huge number.  I can't even get my hands

6    around it, but ---

7            THE COURT:  I had seen numbers as high as

8    $186 million.  Am I -- what am I ---

9            THE COURT:  The hundred and eight -- I

10   apologize, your Honor.

11           THE COURT:  No, no, I'm just trying to

12   figure out why your client doesn't know exactly how much

13   it put into this deal.

14           MR. CASAL:  My client does know.

15   Unfortunately the $186,000 included some amounts that were

16   guarantees that my client owed to other parties that are

17   not in the bankruptcy, and it probably should not -- that

18   number should not have been included, but the actual

19   amount is the amount that we filed in our supplement, and

20   I believe it's $163 million and change.

21           Number two, Ganglu's ability to control the

22   development of this project was highjacked by Mr. Chen.

23   On the eve of having a state court decide Mr. Chen had no

24   right to control the debtors, and interestingly enough,

25   there has been a lot of -- there have been a lot of lawyer

1   speak, and pleadings, and documents, and filings about all

2   the things that Ganglu did wrong, or Mr. Du did wrong, or

3   the fraud that he allegedly committed, or whatever other

4   tortious conduct you can come up with.

5           The reality is that the only time where the

6   evidence was put in play before a judge over three days,

7   and it was that state court judge, Judge Tuter, who

8   decided that it was Ganglu, not Mr. Chen, but Ganglu that

9   was speaking the truth, and that it was Ganglu that was

10  wronged.

11          THE COURT:  No, it was -- if I understand

12  Judge Tuter's ruling, it was that Mr. Du did not sign the

13  operating agreement.

14          MR. CASAL:  That's correct, and it's that

15  operating agreement -- first of all, it's that signature

16  that Mr. Chen says Mr. Du signed, not the operating

17  agreement, but the unanimous consent, but secondarily, it

18  is that agreement that Mr. Chen relies upon in order to

19  say, I can do whatever I want with respect to these

20  entities.

21          Obviously Judge Tuter was going, and I don't

22  think it's too much to speculate that Judge Tuter was

23  going towards that line of saying this agreement is not

24  valid, it's void, and you have to revert to another

25  agreement, which meant that Mr. Chen could have been, or

1  should have been evicted from the manager post of Mapuche,

2  which, in fact, Ganglu tried to do on October 9th before

3  this bankruptcy filing.

4           THE COURT:  Right, but after the bankruptcy

5  filing, on October 14th, Ganglu has not moved to dismiss

6  the case on the basis of lack of authority.

7           MR. CASAL:  That is true, your Honor.  I was

8  not counsel.

9           THE COURT:  Well, what conclusion can I draw

10  from that?

11           MR. CASAL:  The conclusion that was reached

12  from that is that there was a belief by my client that it

13  could work with the trustee to try to -- to try to see,

14  one, if it could get full stay relief so it could get this

15  decision as -- this issue regarding control decided by

16  Judge Tuter.

17           THE COURT:  Yes.  Well, let's not go into

18  that conversation today.

19           MR. CASAL:  I don't want to go into that

20  conversation and, frankly, I'm not here to argue that this

21  case should have been dismissed, or something else should

22  have been done.  We're way beyond that now.  We have to

23  live with what we have before us right now.  We've got a

24  case that's in Chapter 7.  We have a trustee that wants to

25  sell this property under a sale procedure that is like

1   every other sale procedure that we see in cases like this.

2                    But we have a situation where the equities

3   do lean heavily in favor of my client because of these

4   circumstances.

5                    THE COURT:  Well, let me not let you get

6   past that point of the equities that weigh in favor.

7   You've mentioned two.  The first is that your client has

8   $160 million of equity invested in the property.  The

9   second is that your client's control was highjacked by

10  Mr. Chen.

11                   Are there other equities that I should be

12  considering, Mr. Casal?

13                   MR. CASAL:  Yes, your Honor.

14                   THE COURT:  All right.

15                   MR. CASAL:  The third is the decision to

16  file Chapter 7 as opposed to Chapter 11.  I mean, again,

17  this is a situation where the decision was unilaterally

18  made by Mr. Chen for whatever reason, and at some point

19  there will be an adversary at some point down the road,

20  either filed by us, or filed by the trustee, and we'll get

21  to the bottom as to why Chapter 7 was the way to go.  I

22  mean, I don't think there is any ---

23                   THE COURT:  Well, there hadn't been an

24  operating business in nine years.

25                   MR. CASAL:  That is true, but it's also, a

1   very strong argument can be made that the companies were

2   not insolvent, and there wasn't a sit -- we didn't have a

3   situation like we had in 2012 where we had judgment

4   creditors knocking on the door wanting to foreclose, or

5   wanting to collect, or have judgment liens on the

6   property.  GHJ wasn't taking any action.  No one was

7   pressing these debtors in order to take some type of

8   enforcement action, or to put them at risk, or the

9   property at risk.

10              What happened here is that Mr. Chen didn't

11  like the results over across the street in the 17th

12  Judicial Circuit and decided to take matters in his own

13  hands and file Chapter 7, without consulting our client,

14  and ---

15              THE COURT:  Well, but that -- that point,

16  isn't that the same as another face on your second point,

17  or your second list of equities?

18              MR. CASAL:  No, because if -- because if

19  maybe we would have decided, maybe filing for bankruptcy

20  would have been the right thing to do after consultation,

21  but certainly not Chapter 7.  Why am I going to vote --

22  why am I going to vote and approve a Chapter 7 filing that

23  wipes out, potentially wipes out my interest?

24              THE COURT:  Well --

25              MR. CASAL:  It doesn't make any sense.

1          THE COURT:  -- an 11 filing could do that,

2    too, and as I say, your client had the opportunity to come

3    in back in October, November, December and say we

4    shouldn't be here, it was an unauthorized filing.

5          MR. CASAL:  I understand, Judge.  I believe

6    we were bound by a stipulation that prevented us from

7    doing that.

8          The last issue or equity here is the fact

9    that my client has put up $10 million, and the Court may

10   be aware, may not be aware of the difficulties of getting

11   monies repatriated out of China, so that you can make

12   investments in the United States, but my client did come

13   through, and did put up the $10 million, and I am fully

14   confident that to the extent that the Court says, if the

15   case is converted, and if we're going to file a plan, and

16   there is going to be a reserve that's going to be

17   available for disputed claims like Mr. Solomon's client,

18   or anybody else for that matter, that there is going to be

19   sufficient funds reserved or in escrow so that we can go

20   forward with a plan, get it voted.  Those creditors with

21   undisputed claims get paid immediately, or get paid almost

22   their entire share because, I mean, there is going to be

23   enough money to pay everybody, even the disputed claims.

24          THE COURT:  From the $10 million?

25          MR. CASAL:  No, there will have to be a

Page 21

```
 1    reserve --
 2                    THE COURT:  And how much ---
 3                    MR. CASAL:  -- we acknowledge that.
 4                    THE COURT:  How much more is going -- do you
 5    anticipate is necessary?  Your numbers say it's 7 to 10.
 6    Other people suggest 14.
 7                    MR. CASAL:  No, let me, let me -- no, the
 8    10 million is only as to undisputed, and that's a high
 9    estimate.
10            Let me give -- I think we did a preliminary
11    claims analysis, Judge, and I think these numbers are
12    probably consistent with what people are saying.
13            First of all we have taxes of $3 million.
14    Unsecured claims, when you take away a lot of the
15    duplication, there is a -- the schedules are a mess.  The
16    schedules put up many duplicate claims.  They -- for
17    example, they include my client as an unsecured creditor,
18    as well as referencing them as equity.
19            So when you take all of that out, your
20    unsecureds are surprisingly a very manageable number,
21    about $1.3 million according to our analysis.
22                    THE COURT:  Uh-huh.
23                    MR. CASAL:  Your secured claims, and this is
24    going off what GHJ said in their recent filings, you have
25    GHJ's mortgage claim, approximately $13 million; you have
```

1  a, you have a lien claim as a contractor for GHJ and

2  Caddell.  I think the Caddell lien claim is subsumed

3  within the GHJ claim.  That's probably about another

4  2.6 million or some.  So I think if you add it all

5  together, it's a little -- it's fifteen and a half to

6  $16 million.  Administrative expenses, including the

7  $450,000 for the postpetition financing, I'm guessing on

8  the high side, Judge, between 1.5 to $2 million.

9           So, if you add it all up, I think it's a

10  little bit over 21 million, give or take, if my math is

11  right -- it's actually 21 to $22 million.

12           So, at $24 million, we think that we would

13  have enough with regard to the payoff of undisputed and

14  also a sufficient reserve to deal with disputed claims.

15           THE COURT:  And while I appreciate the

16  comment you make about Chinese -- the ability of a Chinese

17  investor to put money into the United States, I'm not

18  quite sure how that cuts.  You're holding 10.  Do I have

19  -- what assurances would I have that your client can come

20  up with another 11 to $14 million to assure creditors,

21  many of whom who have been active in this case have been

22  unenthusiastic about the prospect.

23           MR. CASAL:  Judge, all I can point to is my

24  client's track record, and my client has, whenever asked,

25  has put up requisite funds in order to finance this

1    project.

2                 Unfortunately, it wasn't handled properly.

3    It was mismanaged, probably embezzled, but let's look at

4    the -- let's look, the best example is the 2012

5    bankruptcy.  It was my client that put up the money, the

6    new value money in order to confirm that plan.  It put up

7    $4 million postpetition in order to carry the property

8    through during the confirmation process, and then it put

9    up the rest, so it was a total of $50 million, it put up

10   the rest so that there was sufficient funds not only to

11   pay the secured creditors, who had a very significant

12   claim that was accruing interest at an astronomical rate,

13   but also all of the unsecureds and administrative

14   expenses.

15                So that was a successful, that was a

16   successful reorganization, primarily because my client was

17   able to step up and fund what was asked of it.

18                In addition to that, my client over-funded

19   beyond the $15 million, as set forth in our supplemental

20   filing, as you can see.

21                THE COURT:  You'll appreciate that having

22   confirmed the Chapter 11 cases two and a half or so years

23   ago, how startled I was to see this -- these debtors back.

24                MR. CASAL:  I think that answers the

25   question as to why we think we should be here or not be

Page 24

1    here.

2              THE COURT:  Talk to me, and I don't know if

3    you were planning to go into this subject or not, talk to

4    me about either the philosophical or juridical question of

5    why I should prefer, in this context, a Chapter 11 over a

6    Chapter 7 sale.  In either case it seems to me the

7    property, the improvements, if that's the right word, on

8    the real estate are either going to have to be torn down

9    or substantially amended.

10             I think I get the drift in the various

11   pleadings I've read in the last few days, that pretty much

12   everybody thinks that this, whatever is there, needs to be

13   torn down.

14             What's -- while, as a Chapter 11 lawyer, my

15   goal was to restructure companies, and I always had a

16   strong bias, and I think the Court's did, in favor of

17   reorganization, which included the preservation of going

18   concern value, and jobs, and sort of an inherent bias in

19   the Code that favored reorganization, but there is no

20   going concern here, there are no jobs to save except for

21   the night watchman, and he'll be there no matter what

22   happens, and their -- under any scenario, whatever

23   improvements there are there, which Mr. Levy's client may

24   put a negative value on, are going to go away.

25             So, we're starting from scratch in either

1    scenario.

2                Tell me what it is I should be thinking

3    about to analyze whether there is a some philosophical or

4    judicial bias -- juridical bias that I should prefer a

5    Chapter 11.

6                MR. CASAL:  Well, I think, your Honor,

7    you've hit the nail on the head.  The public policy does

8    strongly favor reorganization and rehabilitation.

9                THE COURT:  Sure, but for reasons.

10                MR. CASAL:  And I understand, you know, we

11    don't have, in the generic sense, an operating company

12    with employees that are making widgets or selling things

13    and, you know, it's something that we want to try to save.

14                I mean, for all intents and purposes we have

15    vacant land, we have raw land here.

16                THE COURT:  I think Mr. Levy's client would

17    prefer that, actually.

18                MR. CASAL:  And I think that's something

19    that we would like to accommodate the city with after --

20    you know, if this case is converted.  That's obviously one

21    of the plans of action that we would like to move forward

22    on with the city if that happens, but getting back to your

23    policy concerns, going back to 706(b), the decision to

24    convert is at your discretion, your Honor, and it's based

25    on what will most inure to the benefit of all parties in

1  interest.  So, we know that in this Chapter 7 363 context,

2  as represented by Mr. Welt, that not all parties in

3  interest will derive a benefit, or the benefit that

4  they're seeking under that scenario, because I know that

5  Ganglu will not receive a return on its investment.

6          I know even, and it pains me to say this, I

7  know Mr. Chen will not receive a return on his investment.

8  The creditors will get paid, but equity will not.  Under

9  our scenario the creditors will get paid, and equity has

10 an opportunity to recover its investment, and ---

11         THE COURT:  But doesn't it have exactly the

12 same -- doesn't Ganglu have exactly the same opportunity

13 by bidding?  I mean, I'm trying, struggling to understand

14 what the difference is.

15         MR. CASAL:  The problem with Ganglu bidding,

16 your Honor, is that Ganglu should not be forced -- and I'm

17 not aware of anything under the Bankruptcy Code, or in any

18 of the cases that says that equity, when all creditors are

19 paid in full, is required to bid against itself, against

20 third parties in order to retain its interest.

21         If it wants to, if it wants to bid against

22 Mr. Chen, who has a 1 percent interest, okay, maybe then,

23 maybe Mr. Chen has some say in that, but with regard to an

24 outside third party that has no interest in this entity,

25 after all creditors have been paid, and we're basically

1   down to a two party dispute, why should a third party

2   developer be able to come in and outbid my client?  I'm

3   not aware of anything under the code that says that that's

4   a salutary effect of keeping a case in Chapter 7 and

5   allowing a 363, when all creditors are going to be paid,

6   and when equity is willing to step up to the plate and

7   payoff everybody.

8                   I can understand that if equity wanted to

9   put in a plan that was not a hundred percent plan or

10  something, then that's a different story.  That's not the

11  case here.  That's not what we're proposing.  We're

12  proposing a 100 percent pay out to all allowed claims.

13  Are there going to be disputed claims?  There sure are.

14  Chapter 7 trustee is going to litigate and there is going

15  to be disputed claims.  The Chapter 7 trustee is not going

16  to sell this property and then immediately make

17  distributions to all creditors.  The Chapter 7 trustee is

18  going to do the sale, it's going to collect the money, and

19  then he's going to decide, okay, now who do I need to sue,

20  or whose claim do I need to object to.

21                  And there will be some that are not

22  disputed, and there will be interim distributions, and it

23  won't be a hundred percent, and it will be over time, too

24  and Mr. Welt is very good at what he does, but litigation

25  is not fast.  So, it's going to take some time.

Page 28

1              I think under our circumstances, we're going

2   to be in a position on the effective date of a plan of

3   reorganization, when a -- at least with respect to

4   undisputed claims, we're going to be able to pay them off

5   immediately.

6              And I think those are -- those are pretty

7   good reasons, at least just from a purely, what are we

8   trying to do in bankruptcy scenario, those are pretty good

9   reasons why converting this case to Chapter 11 and

10  allowing a plan to be proposed and confirmed, it's worth a

11  shot.

12             Your Honor, I have other -- I can deal with

13  the objections.  I don't know if you prefer to hear from

14  opposing counsel on the objections.

15             THE COURT:  Do others have a preference of,

16  should I let Mr. Casal knock down his straw man, or let

17  you all raise him up first?

18             MR. MOSES:  If Mr. Casal is comfortable, I'm

19  happy to yield.

20             THE COURT:  Okay.  Do it that way,

21  Mr. Casal.

22             MR. CASAL:  I just, the only objection,

23  again, that I want to deal with is -- and, again, I think

24  the arguments are pretty well set out with regard to the

25  trustee, Mr. Chen, even GHJ, and even Mr. DeSouza, which

1    is a mind boggling objection for a lawyer representing the

2    company in which my client has a 99 percent interest, but

3    that -- we'll have that argument another day.

4                    THE COURT:  Presumably he's a creditor.

5                    MR. CASAL:  Well ---

6                    THE COURT:  At least he thinks he is.

7                    MR. CASAL:  Well, it sure didn't sound like

8    a creditor objection.  It sure sounded like an advocate

9    objection, but ---

10                   THE COURT:  Well, I read relatively few

11   objections that aren't advocate objections, Mr. Casal.

12                   MR. CASAL:  But when he's advocating on

13   behalf of my client's entity against him, I think that's

14   unusual.

15                   THE COURT:  It sticks in the craw, I'm sure.

16                   MR. CASAL:  It sure did, but getting back to

17   the City of Plantation.  We have had conversations with

18   the city, Mr. Levy is aware of this.  Obviously the city

19   is in a difficult position as to which way it should go.

20   It's made, obviously, in its objection its decision that

21   it's going to side with the trustee for the time being.

22                   But, again, we asked the question of, you

23   know, why should the trustee's recommendation of what

24   should be done trump equity when it's the same result for

25   the creditors, and for the city, we have the people in

1    place now, and they're real.  I have three joint venture

2    partners, I'm authorized to disclose, one of them is ECI

3    Group, Inc., a very reputable company, it's been around

4    for 40 years, it's developed many, many properties and

5    projects over the years.  The other is Colonnade

6    Properties.  Again, another very significant joint

7    venture, potential partner that has developed many

8    properties, both in Miami-Dade and in Broward County, and

9    as Mr. Hellinger has intimated to me, we're very close on

10   the term sheet.

11              So, this is real, and this is happening, and

12   whatever happens after this hearing, your Honor, we're

13   going to be meeting with the City of Plantation next week.

14   We're going to ask for a meeting.  We're going to talk to

15   them, because they deserve to be heard from us as to what

16   our vision is, and we believe that we can present a vision

17   that is the most palatable for the city, and is consistent

18   with their long term needs.

19              I don't think the trustee has the ability --

20   and this is not a knock on the trustee.  The trustee

21   really doesn't care about that.  I mean, he may care

22   individually, but his responsibility is not to see that

23   the property is sold to someone who can develop it in the

24   best interest of the City of Plantation.

25              THE COURT:  Well, that may well be true, I

Page 31

1    haven't thought about that very carefully but, you know,

2    the -- when considering a sale, I would expect that if the

3    city had views of which is a better, rather than higher,

4    bid, that it would express them, and so while Mr. Welt may

5    be agnostic on the issue, other parties in interest will

6    not be, and as you indicate, the city's views really ought

7    to matter in this because they've had to put up with this

8    derelict for nine years.

9              And, you know, highest and best are not

10   fully consistent terms when considering a 363 sale and,

11   you know ---

12              MR. CASAL:  What we're proposing,

13   your Honor, if this case is converted and we're allowed to

14   proceed with the reorganization route, is to provide the

15   city with the highest and best use.  That is, that is,

16   that is, our interests are completely aligned with the

17   city in that regard, and that I think is the big

18   difference between staying in Chapter 7 and allowing us to

19   convert the case to a Chapter 11.

20              Unless you have any other questions,

21   your Honor?

22              THE COURT:  I think I'm good for now, but

23   I'm sure I'll hear from you again.

24              MR. CASAL:  Thank you, Judge.

25              THE COURT:  Thank you, Mr. Casal.

1           Mr. Moses.

2           MR. MOSES:  Thank you, your Honor.

3           The trustee does not believe that conversion

4    will serve the interest of all parties in this case.  I

5    believe you'll hear a uniform voice from the creditors and

6    interested parties that conversion is a bad idea.  The

7    trustee, as a fiduciary to these estate, believes that

8    conversion is a bad idea.  The City of Plantation, which

9    knows Ganglu, believes that the motion should be denied,

10   and the trustee sale process should move forward.  GHJ

11   Construction, the GC and lender on the office tower thinks

12   conversion is a bad idea.  Caddell Construction, a

13   contractor on the office tower, objects to conversion.

14   The DeSouza Law Firm, your Honor, is a creditor, and

15   prepetition counsel to Mapuche, called my description that

16   the parties were embroiled in continuous litigation the

17   understatement of the year, and you'll also hear from

18   Mr. Chen, through Mr. Markowitz, that conversion is a

19   terrible idea, and certainly his interest would be unduly

20   prejudiced through a Ganglu supported plan.

21           Now why does the trustee think conversion is

22   a bad idea?  Well, as your Honor pointed out, there is no

23   reason this case should be in a Chapter 11.  There is no

24   business to reorganize, no jobs to preserve, no going

25   concern value to maintain here.  The mall has been shut

1    down for the greater part of a decade.

2              And, your Honor, but for a few speed bumps,

3    and some dramatic moments, this should be a relatively

4    straightforward litigation case.  We should sell the

5    property, create a pot, object to claims, pursue

6    litigation, make distributions, close out the case.

7              Obviously there are some complexities here,

8    and there is absolutely nothing garden variety about this

9    case.  This is the most efficient manner of administering

10   this estate, and it's the trustee's job to make sure that

11   the property is maximized for the value for the benefit of

12   all creditors, not one particular shareholder.

13             We have that process set up right now.  We

14   have our stalking horse APA.  We hired CBRE.  We have

15   their deposit in my trust account.  We had buyers actually

16   negotiating for the stalking horse position.  We were able

17   to negotiate a higher purchase price and a lower breakup

18   fee as a result of that.  Through the marketing efforts of

19   CBBE and the trustee, we have 75 NDAs signed in 14 ---

20             THE COURT:  75 NDAs signed?

21             MR. MOSES:  75 nondisclosure agreements, so

22   we have a lot of interest.  We had 14 tours to date, and

23   this is before, assuming we can get to a bidding procedure

24   process, this is before that's even happened.  We're

25   looking for approval of bidding procedures that are well

1   established and designed to maximize the value.  So we're

2   actually confident that 24 is just the beginning.

3   Obviously that would be the case if we're allowed to move

4   forward at this time.

5                    We're also not looking to alienate any party

6   from participating in our process.  Your Honor observed

7   this, if Ganglu submits a qualified bid, they can

8   participate like everyone else.  We're not looking to

9   penalize them.

10                   If they're the 99 percent owner, or the

11  80 percent owner, whatever percentage that is, they're

12  outbid, and after the claims are paid, then they'll

13  realize the difference.

14                   And your Honor also pointed out, if they

15  outbid everybody else, they're playing with house money,

16  and so, you know, that's going to come back to them, and

17  they certainly do have the ability to realize on their

18  investment, whatever extent that investment may be, if

19  they've outbid everybody, they'll realize the extent of

20  their investment.

21                   And, your Honor, in that regard, they

22  actually probably have an advantage over every other

23  bidder in a trustee auction process.

24                   THE COURT:  Why is that?

25                   MR. MOSES:  Well, if they're bidding with

1    house money.

2                    THE COURT:  Oh, yes.

3                    MR. MOSES:  Conversion to a Chapter 11, on

4    the other hand, will bring uncertainty, litigation, delay

5    and risk.  Well, uncertainty, we don't even know what

6    their plan of reorganization says.

7                    They filed their motion to convert about a

8    month ago.  They didn't attach a plan.  They didn't attach

9    a disclosure statement.  They had a whole month to file

10   something with the Court.  We saw a notice of filing late

11   Tuesday night, which was a -- generally a noncommittal

12   term sheet.  So we don't know what the plan is going to

13   say.  We don't know whether it's going to provide for

14   releases for Ganglu and Mr. Du.  We don't know what's

15   going to happen with respect to the pre-bankruptcy

16   litigation commenced by Mapuche versus Ganglu and Mr. Du.

17   We don't know what's going to happen with the rest of the

18   litigation, or how claims are going to be estimated.

19                   THE COURT:  I'm sure Judge Tuter would enjoy

20   all of that, or most of that litigation, just a lot.

21                   MR. MOSES:  Well, those are causes of action

22   that belong to the estate at this point.

23                   THE COURT:  Indeed.

24                   MR. MOSES:  Will there be a Chapter 11

25   trustee, or will there be now a CRO, as implied in their

1  term sheet?  What does that mean?  Is that a CRO with

2  expanded powers?  What would the U.S. Trustee have to say

3  about something like that?

4          They also reference a new value plan.  Well,

5  if it's a new value plan, is LaSalle implicated?  I don't

6  know.  But if LaSalle is implicated, would there not have

7  to be an auction for equity?  Well, we already have an

8  auction set up ready to go right now.

9          We're also confident that there will be

10 litigation over feasibility of a plan.  The $14 million to

11 be put up in a few months, where is it coming from?  We

12 have no guarantees that it's going to come in, and other

13 than Mr. Du's -- or Ganglu's track record of putting money

14 in.

15         We've also heard that there is no, there is

16 no agreement on any joint venture to develop the property.

17 They're very close on a term sheet.

18         Okay.  We don't know whether the $14 million

19 is even going to be enough to satisfy all creditors'

20 claims.  The bar date is not until next week.

21         Correct -- they're generally correct that

22 the undisputed claims are in the $10 million range.

23 That's not a, that's not an unfair estimate.  But if you

24 look at GHJ's claim, at 13, $14 million, there is a claim

25 that was filed a few days ago for $17 million, you put

1   those two together, that's $30 million.

2              THE COURT:  Well, who filed that claim?

3              MR. MOSES:  A creditor called Gen Gee Star

4   (phonetic).  Now, I'm not going to comment on the merits

5   of the claim.  There is -- obviously there is going to be

6   a lot of objections that are going to need to be filed,

7   but the numbers may be in excess of $24 million at the end

8   of the day.  We don't know at this point.  The bar date

9   hasn't been, hasn't passed us at this point.

10             So there will be litigation over

11  feasibility.  There will certainly be litigation over

12  treatment of claims or interests.  Again, we haven't seen

13  the plan, but Ganglu has certainly telegraphed that it's

14  not going to provide for Mr. Chen's ownership interest,

15  and you can be certain that the prepetition litigation

16  that was firing at all cylinders will certainly flame up

17  in a contested Chapter 11 process.

18             Also, if the case in converted, we'll have

19  no exclusivity.  So you can see competing plans filed by

20  Mr. Chen, maybe by a Chapter 11 trustee, maybe by a number

21  of developers that may choose to purchase a claim and

22  participate.  Now, wouldn't that be an interesting or

23  messy situation?  Your Honor can envision a situation

24  where that actually may create a competitive environment,

25  or an auction for competing plans.  Well, Judge, we have

1    an auction set up and ready to go.

2              Conversion also creates risk on a number of

3    levels.  It might even create a risk of default under our

4    postpetition loan documents.  It will also cause a risk of

5    delay.  Your Honor, we borrowed enough money to get us

6    through a sale process.  We should be out of money June or

7    July.

8              So if we have a delay in a Chapter 11 that

9    fails for whatever reason, and we're rushing to tee up

10   another sale down the road, we're going to have to

11   scramble and borrow more money at more cost.

12             Conversion also creates risk of any future

13   sale.  If we're required to cancel our contract with our

14   stalking horse, return the deposit, notify all of our

15   interested buyers after all of our marketing efforts to

16   date that, all right, we're going to put this on hold, you

17   know, we'll give the conversion route a try, our chances

18   of getting those buyers back to the table after a failed

19   11, at least at the level of interest that we have right

20   now, is going to be difficult at best, and we have a

21   representative of CBRE in Court.  They have told us that

22   the buyers have serious concern over this looming

23   Chapter 11 conversion motion and, your Honor, we think

24   that that's exactly what Ganglu wants.

25             Ganglu even recognizes the chilling affect

1   of its motion in its term sheet.  They say, if we fail in

2   a Chapter 11, we don't object to the trustee trying to tee

3   up a sale with CBRE down the road, and if we can't find a

4   stalking horse after all this happens, well, guess what,

5   they'll step in as a stalking horse.  Of course it will be

6   at the lesser of $24 million, or an amount necessary to

7   pay all claims, but we're not going to give anything to

8   Mr. Chen.

9              So, your Honor, for all of these reasons, we

10  think that conversion is simply a bad idea.  Your Honor

11  should let the sale move forward without this overhanging

12  cloud of the motion to convert, and we'd ask that you deny

13  the motion.

14             THE COURT:  Thank you.

15             Does anyone else wish to be heard?

16  Mr. Levy.

17             MR. LEVY:  Your Honor, Mark Levy on behalf

18  of the City of Plantation.

19             It's no secret the city's desire here, as

20  we've said before, is to put this property back into

21  productive economic use.

22             The reason we decided to come off the

23  sidelines and file the opposition, which we did, which I

24  won't go over chapter and verse, I know you've read it, is

25  because we just weren't comfortable with taking the risk

1   and not knowing what was going to happen, and when you

2   were questioning Mr. Casal on the issue about what kind of

3   assurance there could be that above the $10 million that's

4   already been deposited, the rest will come in, and his

5   answer was, all I can do is point to my client's track

6   record.

7            And looking at his client's track record,

8   and the debtor's track record is what the city did when it

9   said that it doesn't want to go through the risk and

10  uncertainty of more of the same, and more of this property

11  sitting fallow, and it wants to eliminate that risk, and

12  get a responsible developer on board to bring this

13  property to its best use.

14           Thank you.

15           THE COURT:  Thank you, Mr. Levy.

16           Ms. Rosich-Schwartz.

17           MS. ROSICH-SCHWARTZ:  Good afternoon again,

18  your Honor.

19           The U.S. Trustee has the same concerns that

20  the trustee raised in his objection, and some of ones that

21  the City of Plantation raises, your Honor.

22           We believe at this point that converting the

23  case would be to the detriment of all the parties, and it

24  would only delay the processes that are currently pending

25  with the Court, including for the sale of the property.

```
 1              As Mr. Moses pointed out, your Honor,
 2   although the motion was filed, although $10 million were
 3   put on, we have not seen a plan and disclosure statement
 4   proposing what they plan and propose if it's a Chapter 11.
 5   So we don't know what will happen, your Honor.  It carries
 6   a risk of chilling the bidding process that is currently
 7   pending, which looks like it's going very well, and that
 8   it looks like the auction is going to be a very robust
 9   one, and we believe, your Honor, that even converting the
10   case and appointing a Chapter 11 trustee, which is one of
11   the options that they mentioned, would only do the same
12   thing that the trustee is doing here.  If the trustee is
13   only going to collect all the assets, and liquidate those
14   assets, and try to reorganize the debtor, but in this case
15   the debtor is not operating.
16              So, for all those reasons, your Honor, we
17   believe that the case should remain where it is.
18              THE COURT:  Thank you.
19              Mr. Solomon.
20              MR. SOLOMON:  Thank you, your Honor.
21   Steven Solomon, once again, on behalf of GHJ Construction.
22              Your Honor, as you've heard today, GHJ
23   Construction is the largest secured creditor, with a
24   mortgage against the property for a value of in excess of
25   $13 million.
```

Page 42

1          GHJ was also the general contractor on the

2     property, and GHJ has recorded a claim of lien

3     representing an amount of about $2.6 million, and without

4     repeating what we believe to be excellent arguments made

5     on behalf of the trustee today, there are a couple of

6     comments that were made by Ganglu that we wanted to

7     address.

8          One is, with respect to disputed versus

9     undisputed claims.  Ganglu argues in a Chapter 7 case the

10    property gets sold, and who knows how long it's going to

11    take to ultimately reconcile those claims that are

12    disputed from those that are undisputed, then litigate the

13    undisputed claims until a point that they're allowed.  I

14    believe that's also mutual.  In either case it certainly

15    behooves Ganglu to litigate claims, because to the extent

16    they're able to reduce claims, the value in the reduction

17    inures directly to their benefit.

18          Not to say that the trustee isn't going to

19    litigate claims as appropriate to a point that they're

20    resolved in an appropriate manner, but either party here

21    is going to litigate claims until the point that they get

22    resolved.

23          Court Paper 242, which was filed as a

24    supplement by Ganglu, includes a plan term sheet, and in

25    that term sheet it states that while $10 million is on

Page 43

1   deposit with Holland & Knight, the balance of the

2   $14 million will be ---

3               THE COURT:  "The balance of 14 million", not

4   "the balance of the 14 million".

5               MR. SOLOMON:  Right, exactly, I'm sorry.

6               THE COURT:  Okay.

7               MR. SOLOMON:  The balance of $14 million on

8   or before the confirmation hearing of Ganglu's Chapter 11

9   plan, Ganglu will file with the Court proof of a reserve

10  amount up to 14 million in the form of either cash, a

11  letter of credit, or a surety bond acceptable to the

12  Bankruptcy Court.

13              So, what creditors have is behind Door

14  Number 1, a contract with RAM Realty for $24 million,

15  which gets us the $24 million, or the possibility that

16  behind Door Number 2, there may be a plan that could get

17  confirmed, and maybe 14 additional million dollars will

18  somehow come through either a joint venture partner, or

19  some other letter of credit, or surety bond, or some other

20  way Ganglu will be able to, they're telling us they'll be

21  able to at some point, whenever that date is in the

22  future.

23              So, from a creditor's perspective, go behind

24  -- you know, let's take the bird in the hand.  You know,

25  we've got $24 million, and if you -- you know, if you look

```
 1   at either the trustee's calculations, or Ganglu's
 2   calculations, you know, either way 24 gets us pretty
 3   close, and I strongly believe that the bidding is going to
 4   go well north of $24 million.
 5              So I don't even think we're comparing apples
 6   to apples, because I think that at the conclusion of the
 7   auction sale, there is going to be a number that's
 8   presented to the Court on the hearing to approve the
 9   prevailing bidder, and that number is going to be a very
10   substantial number, well in excess of $24 million, and I
11   think we talk about, you know, the redevelopment risk, and
12   what's going to happen with the City of Plantation.
13              Anyone, RAM Realty, anyone who is going to
14   come buy this property, they're going to -- they're
15   spending a substantial amount of money and they're going
16   to address the City of Plantation, and they're going to
17   make sure that they're working closely to ensure that this
18   is going to be a successful project that's going to be in
19   tune with the interest of the City of Plantation.
20              Court Paper 242 also provides something
21   called an initial draft predevelopment plan for Fashion
22   Mall.  It's a 19 point plan, and near the bottom of that
23   plan, work on securing the necessary equity for the
24   project via capital contributions from ownership and
25   through a new United States equity partner.
```

1          I mean, again, highlighting the point that

2    while they're bullish on their opportunity to collect, you

3    know, the additional money through an investor, it hasn't

4    happened yet, and while it's interesting to look at this

5    19 point plan, again, looking at it very simplistically

6    from a creditor's perspective, why wouldn't we just take

7    the money?

8          You know, it's great that they have this

9    wonderful plan, and they have an opportunity to execute on

10    that plan.  As the trustee has argued today, we welcome

11    equity to the extent that they meet the criteria of a

12    qualified bidder, absolutely, you know, and they may, they

13    may -- you know, Ganglu may come to this auction, the

14    bidding may get so high they say, you know what, we're

15    better off taking our equity and running.  We'll make more

16    money just cashing out today then the hassle factor

17    associated with hopefully accomplishing this, you know,

18    this plan.

19          Another thing I thought that the Court might

20    be interested in, because it's something that, except for

21    Mr. Jones, I don't think anybody in this courtroom is

22    aware of, but GHJ, as the general contractor, reached out

23    to the various subcontractors who have all worked on this

24    project, and have claims of lien, and on January 29th GHJ

25    conducted a meeting at my office, with a mediator, and

1    brought in all of the subcontractors who are, of course,

2    very concerned about when they're going to get paid, and

3    we had a full day meeting, a very successful meeting,

4    Caddell Construction, our prime subcontractor was there,

5    and represented by Mr. Jones, and at that point,

6    January 29th, the motion to approve the bidding procedures

7    had already been filed, and so the subcontractors were

8    made aware, many of them not represented by counsel, but

9    made aware of the fact that there is a contract for RAM

10   Realty, and the reason that GHJ orchestrated this

11   mediation is because these subcontractors are each parties

12   to the contracts with either Caddell or with GHJ

13   Construction, for which they're entitled to be paid.  They

14   have claims of lien against the property, but they also

15   have contractual claims against the contractor who

16   retained their services, and these contractors, they

17   range, I mean, there is some mom and pops, and there is

18   some big companies, and we heard at that day long

19   mediation that there are some subcontractors out there

20   that are holding on to be able to stay in business because

21   of the magnitude of this project, and while I don't

22   represent the interest of those subcontractors, the

23   sediment certainly was, we need to reach an exit as

24   quickly as possible, and the auction process that has been

25   proposed by the trustee here gives those subcontractors

Page 47

1    exactly that.

2              It's not the fact that there is $10 million

3    in a trust account at Holland & Knight, it's timing, and

4    the process that the trustee has established will

5    certainly get those subcontractors, especially those with

6    undisputed claims, paid in a much, much more expeditious

7    manner than what you've heard from Ganglu.

8              Thank you very much.

9              THE COURT:  Thank you, Mr. Solomon.

10             Mr. Jones.

11             MR. JONES:  Good afternoon, your Honor.

12   Jason Jones on behalf of Caddell Construction.  I will be

13   very brief, in that I echo the sediments of the trustee's

14   counsel, as well as GHJ, and as well as the City of

15   Planation.

16             I may be speaking out of turn here, but from

17   what I understand, the whole purpose of the state court

18   litigation was to dissolve the company, and now they come

19   in and try and reorganize the company.

20             So, I'll let maybe Mr. Chen or Mr. Casal try

21   and speak to that issue, but in any event, we do join in

22   the arguments of the trustee and the other parties, and

23   wish that you deny the motion.

24             THE COURT:  Thank you, Mr. Jones.

25             Mr. DeSouza.

1          MR. DeSOUZA:  Your Honor, I'll be brief as

2   well.

3          As Mr. Casal humbled me by pointing me out

4   as an advocate, it's true, your Honor, I'm an advocate,

5   I'm an advocate as a creditor of my firm to get paid, and

6   it's my belief that the quickest way, as you just heard,

7   is going to be through this process that's already

8   established, this auction process, and as is in my

9   joinder, in the trustee's objection, really just two

10  points, your Honor.

11         One is, I've been living and breathing

12  between these two parties since May 14th when this

13  underlying dispute that led to the bankruptcy was first

14  filed just down the hall, over in Judge Cohn's courtroom,

15  and this has been a continuous, if you want to call it

16  that, fight from May 14th until mid-October, when this

17  case was filed.

18         This was an everyday bloody battle between

19  these two equity partners that I know for a fact is going

20  to continue over if this thing is converted into a

21  Chapter 11, and the claims and the lawsuits that will fly

22  back and forth between these two are going to delay,

23  delay, delay.

24         My primary interest is getting my firm paid

25  as quickly as possible, and I think the way to do that is

1  in the process that's already in place, and the second

2  point, your Honor, as I think was just raised, is this

3  case started off in May, I believe it was May 14th, 2014,

4  with two causes of action by Ganglu.  It was dissolution

5  and appointment of a receiver to oversee the dissolution

6  process.  Ganglu amended its complaint three, four -- it

7  was either three -- somewhere between three and five times

8  during the state court litigation.  For five months the

9  state court litigation, that complaint was always

10  dissolution, appointment of receiver.  It wasn't until

11  this motion to convert was just filed that Ganglu has

12  decided this company is worth saving.  Throughout the

13  entire state court litigation, it was, sell the assets,

14  liquidate, put a receiver in place.

15            The only difference between the state court

16  litigation and what we have right now is that in state

17  court Ganglu was actually seeking appointment of Mr. Du's

18  son, a 25-year old with no business experience, as the

19  receiver of the company.

20            Thank you, your Honor.

21            THE COURT:  Thank you, Mr. DeSouza, I had

22  read that, and found that an interesting proposition.

23            Mr. Markowitz.

24            MR. MARKOWITZ:  Thank you, your Honor.

25            A lot of what I had to say has already been

1    said.  So, I'm not going to repeat it, but I would point

2    out that after the lawsuits were filed in state court and

3    this Chapter 7 proceeding was filed, there were

4    negotiations between the trustee and Ganglu which resulted

5    in a stipulation that I won't belabor, I know your Honor

6    is well aware of it, but it provided that they would not

7    contest the filings if the trustee would agree to stay

8    relief.

9           Ultimately there was a hearing on stay

10   relief, and other interested parties, including Mr. Chen,

11   argued against it.  Your Honor denied stay relief, but ---

12          THE COURT:  Well, I granted it to a limited

13   extent, and --

14          MR. MARKOWITZ:  Right.

15          THE COURT:  -- am I correct in understanding

16   that Judge Tuter has not entered an order memorializing

17   that ruling, is that right Mr. Berman?

18          MR. BERMAN:  Yes, your Honor.

19          THE COURT:  Thank you.

20          MR. MARKOWITZ:  Your Honor, as a result of

21   that they're here, and they've consented to the relief

22   here.  So to complain about it is really a non-event at

23   this point.

24          Mr. Chen asserts that he's entitled to

25   20 percent of the equity in this entity, not 1 percent.

Page 51

1    Ultimately at the end of the day, I believe when

2    your Honor finds -- determines that equity is in the money

3    in this case, I believe your Honor will ultimately decide

4    who owns how much, and how that's sorted out.

5               The whole reason for filing this Chapter 7,

6    which I think has been very successful, is to limit the

7    continuous, what I've called, world class hardball

8    litigation.

9               And your Honor will see that while we've

10   been here, an awful lot has been accomplished.  The

11   trustee has got this amazing sale process going on, and

12   the fight hasn't started yet.  Hopefully there wouldn't be

13   one, but in this particular instance the fight will be

14   after there is something to fight over, not in the middle

15   of trying to sell the property, and trying to subvert the

16   efforts to sell the property.

17               I can see a scenario here, if this case is

18   converted, that there is a half a dozen or more plans of

19   reorganization filed, and what's going to end up

20   happening, there is going to be indirectly a bidding war

21   among plan proponents, and the expense of doing that is

22   just ridiculous, and for that reason alone it seems like

23   it's much wiser to keep the case right here in Chapter 7.

24               Ganglu talks about all of the money that it

25   has invested, and for example, there is no doubt that

1  forty eight and a half million dollars was put into the

2  debtors to fund the last plan of reorganization, but there

3  were 13 people, if your Honor -- we don't think evidence

4  is necessary, but if your Honor ultimately heard evidence,

5  you would find that 13 people put the $48.5 million in,

6  5 million of which was from Mr. Du.  Ultimately he

7  received that money back.

8                    The records of the company, and

9  Mr. Lieberman can support what I'm saying, have no

10  information at all about how to contact these 12 people.

11  There is no addresses, there is no information, there is

12  no documentation to support their relationship to Ganglu

13  or Mr. Du.  There is no doubt that they -- that these

14  people did put the money in, there is very detailed

15  banking records to show that, but I haven't seen, and I

16  don't think Mr. Lieberman has seen a shred of paper yet to

17  show the relationship directly of those people to Ganglu

18  or Mr. Du.

19                    Thank you, your Honor.

20                    THE COURT:  Thank you, Mr. Markowitz.

21                    Mr. Lieberman.

22                    MR. LIEBERMAN:  Thank you, your Honor.

23  Brett Lieberman on behalf of the debtors.

24                    First, I just want to respond to, Ganglu's

25  counsel raised an issue about why these bankruptcies were

1    filed as 7s.  Principally they were filed as 7s because

2    they're entirely consistent with Ganglu's complaint for

3    judicial dissolution in the state court, and the trustee's

4    proposed sale provides substantially the same relief as

5    would have been provided under Florida Statute 608.4431

6    and 608.444, and the other reason is, the debtors

7    determined that it was in the interest of all

8    constituencies to separate the property from the dispute

9    between the equity partners, and that's what we

10   anticipated would happen in the Chapter 7s.

11            And with respect to what Mr. Markowitz just

12   represented regarding the tracing of the funds that came

13   into the debtors, it's entirely accurate, and while we did

14   our best to identify those entities who transferred money

15   into the debtors, some of the addresses were unavailable.

16   Some of the addresses we were able to identify through

17   Hong Kong's version of SunBiz, and we used those

18   addresses, and we did our absolute best, and I guess to

19   respond to the statement about the schedules, the debtors

20   took an approach to be all inclusive with respect to the

21   schedules, and to give all creditors an opportunity to be

22   notified of the bankruptcy, and to make their own claims.

23   So I wouldn't describe them as being duplicative.  I would

24   describe them as being inclusive.

25            Thank you, your Honor.

Page 54

```
 1                THE COURT:  Thank you, Mr. Lieberman.

 2                Anyone else wish to be heard?

 3                (No verbal response.)

 4                THE COURT:  All right.  Mr. Casal.

 5                MR. CASAL:  Your Honor, some brief rebuttal,

 6  please.

 7                THE COURT:  Yes.  Yes, sir.

 8                MR. CASAL:  First of all, your Honor.  Jose

 9  Casal on behalf of Ganglu.

10                Judge Tuter has signed the order, it was

11  signed on February 5th, 2015 --

12                THE COURT:  Okay.

13                MR. CASAL:  -- nunc pro tunc to October 3rd,

14  2014, and I'll be more than happy to send a copy to

15  Mr. Berman if he doesn't have it.

16                MR. BERMAN:  I do not, Judge.

17                THE COURT:  Good.  I think Mr. Berman would

18  be grateful if you would do so.

19                MR. CASAL:  I assume that -- I received a

20  copy, and I thought all the lawyers of record in that case

21  received copies.  So I don't know what happened there.  I

22  just received it from my client.

23                With regard to, let me see, Mr. Lieberman's

24  comments, I find it interesting that he references the

25  term, the debtors determined this, and the debtors
```

Page 55

1    determined that.

2                    My client was not consulted by Mr. Lieberman

3    or his firm in any capacity with regard to whether to file

4    and what to file.

5                    It's interesting, I actually reviewed the

6    third amended operating agreement, which is the operating

7    agreement at issue, and guess what, it says that the

8    manager does not have the authority to put the company

9    into bankruptcy unilaterally.  You need a vote of the

10   members.  Obviously that was something that was not

11   considered by Mr. Lieberman, or his firm, or Mr. Chen.

12                   THE COURT:  Are you contending that ---

13                   MR. CASAL:  We're beyond that point, Judge.

14                   THE WITNESS:  Okay.  Very good.

15                   MR. CASAL:  With respect to, let's see, let

16   me take them backwards.

17                   With respect to GHJ, a lot of talk about

18   bird in the hand, and the creditors want this, and the

19   creditors want that.

20                   It's not just the creditors, Judge.  It's

21   not only their perspective that matters.  You have a

22   situation where, as Mr. Moses says, there is house money,

23   equity is in play here, and so there is something to be --

24   you have to consider equity, not just the interest of the

25   creditors, but you have to consider the interest of

1    equity.

2                    THE COURT:  So, should I ignore the views of

3    the creditors?

4                    MR. CASAL:  Absolutely not.  Absolutely not.

5    You should take it into consideration and weigh it, but

6    you also have to -- you can't ignore Ganglu, and you can't

7    ignore the interest of equity, particularly in a situation

8    where equity has made it clear that it has -- that it is

9    going to come forward and pay off all creditors.

10                    The bottom line is the trustee is not going

11    to sell this property for $163 million.  I think everybody

12    can agree on that.  So, because of that I think equity has

13    a say, and it should be considered.

14                    We talked a little bit about -- oh, and one

15    more thing about the GHJ issue.  I was a little bit

16    surprised when Mr. Solomon was talking about mediation.

17    The contracts are with GHJ and Caddell.  Nothing is

18    preventing them from writing a check and paying off these

19    mom and pops.  As a matter of fact they're pursuing those

20    claims against the estate.  So, again, they can resolve

21    that problem very simply with a stroke of the pen.

22                    With regard to the City of Planation, and I

23    fully respect Mr. Levy's position, and the concerns of the

24    city, and I know that they have an issue with the track

25    record but, again, I think there needs to be -- there

1  needs to be a distinction with the track record that I was

2  referring to.

3          The track record I was referring to was the

4  ability to fund, and to come up with monies when needed.

5  I agree, the development track record, as represented by

6  Mr. Chen, who was the manager all along in these 10 years,

7  is disastrous, and the city has reason to be upset with

8  his stewardship and administration of this project.

9          There has been a lot of talk about

10  disruption in the case, because the litigation between

11  Ganglu and Mr. Chen is going to spill into the Chapter 11

12  process.  We've addressed that issue, Judge, with our

13  proposal.  We believe a Chapter 11 trustee is the

14  appropriate way to move this case forward in a Chapter 11

15  setting.  We don't believe that this Court should be

16  bogged down with a control or ownership issue between

17  Ganglu and Mr. Chen while we're trying to reorganize this

18  debtor.

19          THE COURT:  Let me, let me inquire of you

20  some on that point.

21          I have not heard you comment on the

22  observation made by several of the other folks who have

23  spoken this afternoon, that if the case is converted to

24  Chapter 11, exclusivity will have been terminated, and

25  that I would be confronted with the prospect of several,

1    perhaps many, competing plans.

2                How, how does that prospect -- why is that

3    prospect more attractive for the interests of creditors

4    than selling the property in a 363 sale in a Chapter 7?

5    It seems to me that you would get into bidding wars in a

6    -- in competing Chapter 11 plans that are not terribly

7    dissimilar from competing bids in a 363 sale, but they

8    would be phenomenally more complicated.

9                MR. CASAL:  First, Judge, the suggestion

10   that the mere conversion of the case to Chapter 11 results

11   the loss of exclusivity is actually not, in my opinion,

12   not accurate.  I believe under 348 the debtor's ability --

13   exclusivity is maintained because you basically have a

14   reordering of relief by virtue of ---

15               THE COURT:  You may well be right, but in

16   your next sentence you said, but the appropriate way for a

17   Chapter 11 to be handled is with a trustee, and as soon as

18   there is a trustee in a Chapter 11, ipso facto, there is

19   no exclusivity.

20               MR. CASAL:  Correct.

21               THE COURT:  So, then what do we do?

22               MR. CASAL:  So at that point, your Honor, we

23   obviously have to approach the trustee, and it is our

24   intention, and we've had communications with the trustee,

25   obviously a lot depends on what the results of this

Page 59

1    hearing are going to be.

2                    If the motion is granted, they'll speak to

3    me.  If the motion is not granted, then I'm not going to

4    get an audience.

5                    THE COURT:  I'd be surprised if Mr. Welt is

6    going to, is going to leave you out in the cold.

7                    MR. CASAL:  That's actually ---

8                    THE COURT:  He ---

9                    MR. CASAL:  That's actually unfair.

10                    MR. WELT:  It is.

11                    THE COURT:  He'd feel as warmly about your

12    money as he would anybody else's.

13                    (Laughter.)

14                    MR. CASAL:  And that is true, and he has

15    invited us, irrespective of the results of this hearing,

16    to meet with him.  So that was not correct on my part, but

17    obviously the perspective and focus will be different.

18    That is a challenge.  There is no question that to the

19    extent that there is a conversion and a Chapter 11 trustee

20    is appointed, then exclusivity goes out the window, and

21    you can have -- Mr. Chen, for example, could file a plan,

22    Ganglu can file a plan, the trustee can file his own plan,

23    and GHJ can file a secured creditor plan, and on and on.

24                    THE COURT:  Well, exactly, and how would I

25    -- in a 363 sale, it's a fatherly clean cut question,

1   highest is certainly clean cut; best is not so clean cut,

2   but certainly people could focus on the quality of the

3   bidder, the likelihood of them carrying through, and

4   parties like Mr. Levy's client, would have the ability to

5   to say, we've investigated this potential developer, and

6   all things considered, Judge, no, please.

7             How could I do that in the context of

8   competing Chapter 11 plans, and wouldn't it be nigh on to

9   a zoo.

10            MR. CASAL:  Not necessarily --

11            THE COURT:  Okay.

12            MR. CASAL:  -- unless everybody wants to

13  come in and pay a one -- do a 100 percent plan, and I

14  don't see people lining up to do that.

15            You may have, you may have -- it's an

16  interesting concept, I think it was Mr. Moses, or somebody

17  who said, what's to prevent a developer from coming in,

18  buying somebody's claim and saying, okay, I'm here.

19            Well, fine, we'll deal with them, and then

20  maybe we'll have to -- you know, the creditors will have,

21  -- and equity will have the opportunity to view these

22  plans in full competition, I don't think it's -- this

23  Court has dealt with much more complex cases than this

24  case, and I don't think there is any problem with setting

25  up scheduling orders, and setting up plan deadlines,

1    saying if you want to file a plan and disclosure

2    statement, here is the deadline, it's going to be on a

3    short leash, and by the way, if you want to do all these

4    things, maybe you require people to put money in escrow,

5    to show that their bona fides and their ability to

6    perform, are no different than in a 363 scenario.  All of

7    that can be managed and organized in a fashion, which this

8    Court is well experienced in doing.

9              So, I don't have, I don't have any problems

10   with anybody else coming in and saying, you know, I'm

11   going to file a competing plan.  Fine, great, I'd love the

12   competition.  Let's see what -- let the best plan win.

13             There was a little talk, a little bit about

14   the chilling of the bidding, and there really isn't a

15   going concern value here.  There is a going concern value

16   here, Judge.  The going concern value is Ganglu's

17   interest.  That's really what we're talking about here,

18   because the creditors are going to be addressed.  So ---

19             THE COURT:  Well, talk -- drill down further

20   for me on that score.

21             A going concern value is the intangible

22   value of an enterprise, represented by what would be

23   booked, in part, as good will, if on an accountant's

24   balance sheet, but obviously it goes far beyond that

25   because accounting is based on historical events that may

1  or may not bear some reasonable relationship to what the

2  financial reality is.

3              But going concern is that intangible quality

4  that makes the business more valuable as a whole.  I don't

5  understand how an equity interest is characterizable as a

6  going concern, and it's sunk money, and whoever ends up

7  with these assets is going to have to apply money, A, to

8  get them, and, B, in a larger amount to develop them, but

9  the fact that your client has $160 million sunk into this

10 project already, what difference is that on a going

11 forward basis?

12             MR. CASAL:  The difference, Judge, is if my

13 client is unable to control its destiny with regard to the

14 disposition of this asset, it will never realize a return

15 on that $160 million.  It will have that opportunity if it

16 is allowed to convert this case, reorganize and proceed

17 forward with a redevelopment plan where five years, eight

18 years, 10 years from now, maybe, they'll have a chance to

19 recover.  That shouldn't be anybody's concern.

20             THE COURT:  Well, wouldn't ---

21             MR. CASAL:  That is my client's concern.

22             THE COURT:  And understandably so.

23             Why would it not have exactly the same

24 opportunity by buying in a 363 sale?

25             MR. CASAL:  Because why should my client

Page 63

1    have to pay ---

2                   THE COURT:  No, no, no, I'm -- don't go to

3    the why should my client have to argument.  Tell me in

4    sort of financial cash flow terms what the difference is.

5                   MR. CASAL:  The difference is is that my

6    client will have to pay more money, potentially, in a 363

7    setting than it would have to pay in a Chapter 11 setting.

8                   THE COURT:  And it will get it back.

9                   MR. CASAL:  But it won't get the property.

10                  THE COURT:  Yes, it would, if it bought it.

11   If it buys it in a 363 sale, it will get the property.

12                  MR. CASAL:  But ---

13                  THE COURT:  And, and if it over pays, that

14   is to say it pays more than the legitimate debts of these

15   debtors, it will get, in your view, 99 percent of the

16   money that's left over.

17                  MR. CASAL:  But it shouldn't have to be --

18   it shouldn't have to compete against itself.

19                  THE COURT:  Why, why shouldn't it compete

20   against any other bidder?

21                  MR. CASAL:  Because once all the creditors

22   are paid, then there is no -- there is no concern over

23   what's going on in this case.  What should be the concern

24   is what's going to happen with this property, and so why

25   should my client, who has the 99 percent interest, have to

1    dig into its pocket and pay tens of millions of dollars

2    more in order to beat back some third party bidder.

3                    THE COURT:  Ah, is this a cash flow problem?

4                    MR. CASAL:  No, it's not.  It's just --

5                    THE COURT:  Then ---

6                    MR. CASAL:  -- it's a fairness problem.

7                    THE COURT:  Fairness problem.  Well, here we

8    sit in a Chapter 7 case that your client, for its business

9    reasons, didn't object to, and I have got a proposition

10   that there are 14 people who have -- 14 entities who have

11   done walk-throughs, and 75 bidders who have done -- signed

12   non-disclosure agreements, and a stalking horse who is

13   putting 24 million up that I presume CBRE has figured out

14   that they, and the trustee, have figured out that they're

15   good for it.

16                   How is your client harmed if there is a 363

17   process where any leftover goes back into its pocket, and

18   you say there is not a cash flow problem.  So I accept

19   that they could come up with whatever it takes to be the

20   winning bidder, because you just told there is no cash

21   flow problem, but morally what's the difference?

22                   MR. CASAL:  I think there is a big

23   difference between coming up with $24 million and then

24   coming up with -- again, I have no idea what the winning

25   bid will be.

1          THE COURT:  Oh, God, I hope the room is full

2  of representatives of drunken sailors.

3          (Laughter.)

4          MR. CASAL:  With cash or gold.

5          THE COURT:  Well, to be sure.  They're not

6  interesting until -- you know, once their pockets are

7  empty.

8          MR. CASAL:  Exactly.

9          The problem for my client, Judge, is that in

10 order for it to make a redevelopment of this project

11 viable, from a financial standpoint, I mean, let's look at

12 this now from a redevelopment standpoint, and my client

13 has a ridiculous basis into this project.

14          Every ---

15          THE COURT:  Sunk, sunk basis.

16          MR. CASAL:  Sunk basis, and every penny

17 hurts.

18          THE COURT:  I don't doubt that one bit.

19          MR. CASAL:  And it's just, when you're given

20 a situation where all of the constituents in the

21 bankruptcy have been addressed except equity, it doesn't

22 make sense to force the one remaining constituency to have

23 to dig into its pocket and go beyond what is reasonable,

24 or what is financially reasonable under the circumstances

25 as to what it's going to -- what it will take in order to

1   retain that interest in that property, and that, and that,

2   it's as if Ganglu is being held out and punished, and I

3   use that word not correctly, but just it's being held out

4   and said, you know, you messed up with your $163 million,

5   so this is the, this is the price you have to pay, and

6   when my client is willing to come forward and address the

7   problems of this estate, caused not by it, but by

8   Mr. Chen, and then to say that it still has to pay more

9   money, I just don't see the fairness and the equity in

10  that.

11              THE COURT:  Let's assume a scenario in which

12  RAM Realty, they're sitting in the -- at the table,

13  acquires standing to file a competing plan, because they

14  actually are prepared to bid more than $24 million, I have

15  to assume whenever I see a stalking horse in a situation

16  in which the property is of in-determined and not easily

17  market valued property, although I suspect CBRE has a

18  pretty good handle on what the market would define this as

19  being worth.  Mr. Hellinger probably does, too.  I think

20  there is just a real likelihood that somebody else is

21  going to come in and say, okay, we're in a Chapter 11,

22  it's going to cost us more, we're going to reduce how much

23  we'd be willing to pay, but we're going to, we're going

24  to, we're going to bid higher than what your term sheet

25  outlines, and then I get into the horrible mess of

1   competing Chapter 11 plans where, as I said, higher and

2   better is a little hard to determine when you're telling

3   with competing plans.

4               I've only heard from some of the, of the

5   creditors, but I've heard from everybody who has appeared

6   in the case.  I'm struggling to envision where you find an

7   accepting class in that context, and I'm seeing a real

8   easy prospect of somebody else coming in and saying, you

9   know, I'm prepared to pay more than 24 mil, and if your

10  client isn't prepared to go more out of its pocket than

11  that, it's going to lose the plan fight, and it might not

12  have a confirmable plan anyway, because every creditor

13  I've heard from in the case says, ahhn.

14              MR. CASAL:  Every creditor has said ahhn

15  because it doesn't want to be in Chapter 11.  But if it's

16  in Chapter 11, then maybe their minds will change,

17  particularly when they're being told that they're going to

18  be paid a hundred cents on the dollar.

19              THE COURT:  Okay.  Anything else you want to

20  tell me?

21              MR. CASAL:  No, no, your Honor.

22              THE COURT:  All right.  Anybody else want to

23  be heard before I take a short recess?

24              MR. MARKOWITZ:  Judge, I do.

25              THE COURT:  Mr. Markowitz, but come up and

Page 68

```
 1   use the mike, because otherwise it will be lost.
 2               MR. MARKOWITZ:  Just one brief comment.
 3               THE COURT:  Yes, sir.
 4               MR. MARKOWITZ:  Your Honor, Mr. Casal --
 5   well, I don't think he's lost sight of it, but his
 6   proposal conspicuously leaves out any equity for Mr. Chen,
 7   and of course there is a scenario here, likely scenario
 8   that there will be money for equity, and at a point in
 9   time it will be appropriate, when we determine what that
10   is, to have some sort of proceeding to determine who gets
11   how much.
12               THE COURT:  Yippie.
13               MR. MARKOWITZ:  And how that plays out is
14   going to have a lot to do with how much it is.  If it's
15   $4.50, it's on fight.  If it's 30 million, it's another
16   one.
17               It's also interesting that the argument is
18   that everything that happened here is Mr. Chen's fault,
19   and I hope your Honor doesn't find it necessary to take
20   evidence, but if you did, you would find out, as always,
21   there is another side to this story that's completely
22   different.
23               THE COURT:  I would be surprised were there
24   not.
25               MR. MARKOWITZ:  Thank you.
```

1          THE COURT:  The merits of either side are

2    something about which I am utterly agnostic.

3          All right.  I'm going to take a short break,

4    and relax, keep your seats if you're so inclined.  I'll be

5    back probably somewhere in the vicinity of 3:15.

6          Thanks.

7          (Thereupon, a recess was had, after which

8       the following proceedings were had.)

9          ECRO:  All rise.

10         THE COURT:  Thank you.  Please be seated.

11         My entire career as a Chapter -- as a

12   bankruptcy lawyer went on for about 30 years, and was

13   spent almost entirely in trying to, and sometimes

14   succeeding in restructuring companies, and I am well

15   sympathetic to the notion that a Chapter 11 case that

16   restructures an existing business, preserves jobs,

17   preserves going concern, is vastly preferable to one that

18   simply amounts to a quick sale and an exist.

19         The Chapter 11 world has changed in the last

20   35, 39 years, and no longer looks quite like it used to,

21   and sales are -- actually how more cases end up than in

22   real reorganizations.

23         Be that as it may, what I'm confronted with

24   here is a case that's been in Chapter 7 since October, and

25   in which the assets are defunct, the business itself has

1   not been operated as a business in more than nine years.

2   Equity purports to have sunk a great deal of money into

3   the business, and now it's in a position -- in the posture

4   of a complete start-over.

5              The litigation between the equity interests

6   that went on in state court immediately prior to the

7   filing of this case was highly contentious and highly

8   divisive, and extraordinarily expensive.

9              Since the Chapter 7 case has been here, I

10  think that expenses have been extraordinarily modest.  I

11  don't know the numbers, I haven't looked at them, but

12  there has been little frenetic activity on anybody's part

13  that I've observed.

14             There is no business to reorganize here.

15  There is no harm to Ganglu if it were interested in

16  preserving its interest in this property.  There is no

17  harm to Ganglu in having to bid for it, just like a third

18  party, and I say that notwithstanding the fact that that

19  position would stick in the craw of Ganglu having sunk

20  $160 million, by its accounting, into the property, having

21  to put in more money in order to keep it, but it's going

22  to have to do that in any event.

23             If it proposes a plan that is maximally

24  funded, as I read the term sheet at about $24 million,

25  that is just matching the first opening bid by the

1    stalking horse, and while you can never predict what an

2    auction sale is going to result in, the level of interest

3    that's reported to me by Mr. Moses suggests that the

4    stalking horse doesn't -- neither the stalking horse nor

5    anyone else expects the property to sell for 24 million,

6    but for some presumably significantly higher amount.

7              Ganglu is not the widow lady who has to save

8    her house, and shouldn't be required to put up money in

9    order to do that because she can't afford it.

10             Mr. Casal has represented to me that there

11   is no cash flow issue here, it's more a matter of pride,

12   as I understood his words to be, and that Ganglu shouldn't

13   have to do that which -- having it be able to preserve its

14   interest in the property only by bidding for it in a 363

15   sale.

16             I can appreciate the frustration, and the

17   irritation, and perhaps perceived unfairness in that, but

18   this is an investment that, whether managed well or badly,

19   Ganglu has made many, many years ago, and ignored for many

20   of those years, and I freely acknowledge, Mr. Casal that

21   your client came up with the money when the Chapter 11

22   cases were here before me, and confirmed in 2012.

23             The uncertainties that are presented by a

24   Chapter 11 conversion here are extraordinary.  It is

25   unlikely to me that an environment in which there is a

1   highly active bidding war, starting at 24 million, it's

2   highly unlikely to me that somebody isn't going to come in

3   and propose a competing plan that says, I'm going to pay

4   more than that, and so I will be confronted at some point

5   down the road, if I were to convert the case to

6   Chapter 11, with competing plans, which are significantly

7   more complicated to put together than a bid in a 363 sale,

8   more expensive, riskier in the sense that when one bids at

9   an auction for the -- for property, you sort of know what

10  you're getting into.  In a Chapter 11 plan that's much

11  harder to know, and as I say, much more expensive and time

12  consuming, and lacks the assurance of the result at the

13  end of the day.  Every creditor who has appeared in this

14  case at any point is here today, and every one of them

15  opposes the motion to convert.

16              If we were starting from scratch, you might

17  get it, Mr. Casal, but we're not, and in the

18  circumstances, and because I haven't been able to perceive

19  the real prejudice to your client if it had to bid in a

20  363 sale in order to try to preserve and enhance the sunk

21  -- receive a return on the sunk cost of $160 million that

22  it's put into the property, I'm going to deny the motion

23  to convert.

24              Mr. Moses, would you give you me an order to

25  that effect?

Page 73

1          MR. MOSES:  I will, your Honor.

2          THE COURT:  Simple would do fine.

3          Now we have another event.

4          MR. MOSES:  Thank you, your Honor, and this

5  is our motion to approve the bidding procedures portion of

6  our sale motion.

7          I'm not going to get into the whole detail.

8  I think I highlighted it in my presentation earlier.  Just

9  a few points.

10          We have received no objection to the bidding

11  procedures section of that motion.  Two points I wanted to

12  highlight, certainly the breakup fee that we propose to

13  pay to RAM Realty in the event that it's outbid and we

14  have a closing, it's $200,000.  We believe it's reasonable

15  under the circumstances, in light of the size and nature

16  of this case, and certainly in light of the risk that we

17  just saw of a potential conversion.

18          And so given the breakup fee is less than

19  1 percent of the purchase price, it's certainly in line,

20  or below the range that's commonly approved in this

21  district and others.

22          And then the other point is the location of

23  the auction, it will not be at my office.  It's going to

24  be at the Sheridan Hotel at the premises.  We'll give the

25  details in that, in the bid notice, which will be

Page 74

```
 1   incorporated within the proposed form of order.
 2                  And so if your Honor is inclined to grant
 3   that aspect of the motion, what we'd like to do is get a
 4   sale hearing no later than the first week of April,
 5   sometime before April 3rd, if your Honor's calendar would
 6   work, and then we'll back in the dates for the auction,
 7   which would be a day or two before the sale hearing, and
 8   then the submission of qualified bids, which would be five
 9   days before the auction itself.
10                  THE COURT:  Well, I am going to be in Europe
11   for the week of March 23 and 30th.  I could -- the latest
12   I could entertain you is on March 20th, otherwise we're to
13   April 9th as the earliest I could entertain you.
14                  MR. MOSES:  If I could have ---
15                  THE COURT:  Why don't you all have a chat?
16                  MR. MOSES:  Yes.
17                  MR. WELT:  Thank you, your Honor.
18                  MR. MOSES:  We'll confer.
19                  THE COURT:  Sure, and you can confer
20   broadly.  I'll ignore you for the moment.
21                  You might -- I'd suggest you mute the mikes
22   because ---
23                  MR. WELT:  Should we go outside, your Honor?
24                  THE COURT:  No, no, you can do it here.  I
25   just don't want you to make a record that you don't mean
```

Page 75

```
 1    to make.
 2                    MR. MOSES:  I believe our stalking horse
 3    would like that ---
 4                    THE COURT:  Okay.  Let me turn -- are the
 5    mikes back on?  Okay.
 6                    MR. MOSES:  I think our stalking horse would
 7    like the sale hearing today.
 8                    THE COURT:  I'm not shocked to hear that.
 9    Good luck with that, Mr. Paiva.
10                    MR. MOSES:  We'll choose March 20th --
11                    THE COURT:  All right.
12                    MR. MOSES:  -- as a sale hearing.
13                    THE COURT:  March 20th at 9:30 then.
14                    MR. MOSES:  And then, your Honor, in the
15    proposed order we'll back in the dates.  We would probably
16    have the auction on the -- well, let me confirm with the
17    parties, but we'll likely have the auction on the 19th,
18    and then qualified bids probably the Friday before.
19                    THE COURT:  All right.  Does anybody have an
20    objection to the approval of the bid procedures, or of the
21    breakup fee, or of the sale hearing schedule?
22                    (No verbal response.)
23                    THE COURT:  Okay.  In the absence of any
24    objection, Mr. Moses, I'll sign on to your proposal.
25                    MR. MOSES:  Okay.  Thank you, Judge.
```

Page 76

1              THE COURT:  Thank you.

2              Before we -- before you all leave, I want to

3    make a comment.  I thought that the quality of the

4    lawyering here today was superb, and I want to thank all

5    of you for that.

6              There are days when I sit up here, and I

7    have other, different experiences, but when I see really

8    good lawyers performing, it's a joy.

9              So thank you all for that, and for helping

10   me educate my law clerk.

11             We're adjourned.

12             MR. MOSES:  Thank you, Judge.

13

14

15             (Thereupon, the hearing was concluded.)

16

17

18

19

20

21

22

23

24

25

Page 77

1

2

3                       CERTIFICATION

4

5   STATE OF FLORIDA        :

6   COUNTY OF MIAMI-DADE    :

7

8               I, Cheryl L. Jenkins, RPR, RMR, Shorthand

9   Reporter and Notary Public in and for the State of Florida

10  at Large, do hereby certify that the foregoing proceedings

11  were transcribed by me from an audio recording held on the

12  date and from the place as stated in the caption hereto on

13  Page 1 to the best of my ability.

14              WITNESS my hand this 5th day of March, 2015.

15

16

17           _____

18            CHERYL L. JENKINS, RPR, RMR

19            Court Reporter and Notary Public
             in and for the State of Florida at Large
20               Commission #FF064003
                 December 27, 2017

21

22

23

24

25